ALASKA COMMUNITY ACTION ON TOXICS and Alaska Chapter of the Sierra Club, Plaintiffs,

v.

AURORA ENERGY SERVICES, LLC and Alaska Railroad Corporation, Defendants.

No. 3:09–cv–00255–TMB.

United States District Court, D. Alaska.

March 28, 2013.

Aaron Isherwood, Peter Morgan, Sierra Club, San Francisco, CA, Brian Litmans, Victoria Clark, Trustees for Alaska, Anchorage, AK, for Plaintiffs.

John C. Martin, Susan Mathiascheck, Crowell & Moring LLP, Washington, DC, David J. Mayberry, Kyle W. Parker, Crowell & Moring LLP, Jeffrey M. Feldman, Kevin M. Cuddy, Susan Orlansky, Feldman Orlansky & Sanders, Anchorage, AK, Denise Louise Ashbaugh, Ralph H. Palumbo, Summit Law Group PLLC, Seattle, WA, for Defendants.

## ORDER

TIMOTHY M. BURGESS, District Judge.

### I.  INTRODUCTION

This is an action by two environmental groups—Alaska Community Action on Toxics and the Alaska Chapter of the Sierra Club ("Plaintiffs")—against the Alaska Railroad Corporation and Aurora Energy Services, LLC ("Defendants") for violations of the Clean Water Act at the Seward Coal Loading Facility.  Plaintiffs and Defendants have filed cross motions for summary judgment on each of Plaintiffs' claims.[1]  Each motion was fully briefed.  On March 6, 2013, the parties presented oral argument on their motions.  For the reasons discussed below, Plaintiffs' motion for summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED, in part, and DENIED, in part.

Both parties have filed motions to strike certain documents from the opposing parties' summary judgment motion.[2]  These motions are DENIED.

### II.  BACKGROUND

#### A.  The Clean Water Act

Congress enacted the Clean Water Act ("CWA") in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[3]  Consistent with this purpose, the CWA prohibits "the discharge of any pollutant by any person" to navigable waters "except in compliance" with other provisions of the CWA, including the National Pollution Discharge Elimination System ("NPDES") permitting requirements (codified at 33 U.S.C. § 1342).[4]  The NPDES "requires dischargers to obtain permits that place limits on the type and quantity of pollutants that can be released into the Nation's waters."[5]

The phrase "discharge of any pollutant" is "defined broadly"[6] to mean "any addition of any pollutant to navigable waters from any point source."[7]  "Pollutant" is defined "to include not only traditional

---

1.  Dkt. 104; Dkt. 112.

2.  Dkt. 132; Dkt. 137.

3.  33 U.S.C. § 1251.

4.  33 U.S.C. § 1311(a);  *see also Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 650, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007);  *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 102, 124 S.Ct. 1537, 158 L.Ed.2d 264 (2004).

5.  *Miccosukee Tribe*, 541 U.S. at 102, 124 S.Ct. 1537.

6.  *Rapanos v. United States*, 547 U.S. 715, 723, 126 S.Ct. 2208, 165 L.Ed.2d 159 (2006).

7.  33 U.S.C. § 1362(12);  *see also Miccosukee Tribe*, 541 U.S. at 102, 124 S.Ct. 1537.

contaminates but also solids such as dredged soil, ... rock, sand, [and] cellar dirt." [8] The term "navigable waters" means "the waters of the United States, including territorial seas." [9] The combined effect of these provisions is that "[t]he CWA prohibits the discharge of any pollutant from a point source into navigable waters of the United States without an NPDES permit." [10]

The Environmental Protection Agency ("EPA") is the regulatory authority tasked with administering the NPDES permitting system for each state.[11] However, EPA may delegate its permitting authority to individual states, after which state officials have primary responsibility, with EPA oversight, for reviewing and approving NPDES permits.[12] EPA delegated its permitting authority to the State of Alaska in October 2009.[13] Alaska administers its program through the Alaska Department of Environmental Conservation ("DEC").[14]

## B. The Seward Coal Loading Facility

The Seward Coal Loading Facility ("Seward Facility" or "Facility") is located on the northwest shore of Resurrection Bay in Seward, Alaska.[15] Defendant Alaska Railroad Corporation ("Alaska Railroad") purchased the Seward Facility in 2003.[16]

The Facility has been operated by Defendant Aurora Energy Services ("Aurora Energy") since 2007.[17] The Facility's purpose is to receive coal by railcar from the Usibelli Coal Mine located near Healy, Alaska, and to transfer that coal onto ships for delivery to out-of-state markets.[18]

When a railcar carrying coal arrives at the Facility, the coal is unloaded at the "railcar dumper facility" and then placed on a conveyer system.[19] The conveyer transports the coal to roughly 1000–foot-long stockpiles for storage or, alternatively, sometimes carries the coal past the stockpiles directly to the ships.[20] At the coal stockpiles, the coal is moved from the conveyer to the piles by the "stacker-reclaimer." [21] The stacker-reclaimer both "stacks" coal onto the stockpiles and "reclaims" coal from the stockpiles to place it back onto the conveyer, which then carries the coal over open water to the "ship loader." [22] The ship loader is a stationary piece of equipment used to discharge coal from the conveyer into the holds of ocean-going bulk carriers.[23]

## C. The Discharges

Plaintiffs' claims in this lawsuit correspond to the following three ways in which

---

8. *Rapanos*, 547 U.S. at 723, 126 S.Ct. 2208 (quoting 33 U.S.C. § 1362(6)) (internal quotations omitted).

9. 33 U.S.C. § 1362(7).

10. *N. Plains Res. Council v. Fid. Exploration Dev. Co.*, 325 F.3d 1155, 1160 (9th Cir.2003).

11. *Nat'l Ass'n of Home Builders*, 551 U.S. at 650, 127 S.Ct. 2518.

12. *Id.* (citing 33 U.S.C. § 1342(b); 33 U.S.C. § 1251(b)).

13. Dkt. 117 at 2; *see also* 73 Fed.Reg. 66243, 66244 (Nov. 7, 2008).

14. Dkt. 117 at 2.

15. Dkt. 1 at ¶ 27; Dkt. 14 at ¶ 27; Dkt. 120–5.

16. Dkt. 118 at 2; Dkt. 120–5.

17. Dkt. 1 at ¶ 27; Dkt. 14 at ¶ 27; Dkt. 120–5.

18. Dkt. 1 at ¶ 28–29; Dkt. 14 at ¶ 28–29; Dkt. 120–5.

19. Dkt. 120–5.

20. Dkt. 1 at ¶ 29; Dkt. 14 at ¶ 29. The average size of the stockpiles is 90,000 to 95,000 tons. Dkt. 120–5 at 1.

21. Dkt. 120–5 at 1.

22. Dkt. 120–5 at 1; Dkt. 120–15 at 7.

23. Dkt. 120–5.

Plaintiffs allege that coal has been, and continues to be, discharged into Resurrection Bay. Plaintiffs assert that: (1) coal falls into the Bay, either directly or as coal dust, during the over-water transfer of coal from the stockpiles to the ship holds; (2) coal dust generated at the stockpiles, and other land-based areas of the Facility, migrate to the Bay as airborne dust; and (3) coal-contaminated snow is intentionally plowed into the Bay and into a pond and wetlands north of the Facility.

### 1. Coal from the Over–Water Conveyer and Ship Loader

The ship loader is located at the end of a loading dock, approximately 1700 feet from the shore of Resurrection Bay.[24] A portion of the conveyer system carries the coal from the stockpiles, over open water, to the ship loader.[25] During the process of transferring coal from the stockpiles to the ship holds, coal may unintentionally be discharged into the water in a number of ways. For instance, residual coal, referred to as "carry back," sometimes falls from the underside of the belt on the return trip.[26] Coal may also fall into the Bay, either as dust or as spillage, during the process of loading the coal into a ship's hold.[27] Although the Facility has implemented measures to minimize both coal sediment and coal dust from entering the water during this process, Defendants do not claim to have eliminated the discharges completely.

### 2. Windblown Coal Dust

On windy days, coal from the Facility's land-based activities (rather than coal discharged into the Bay from the Facility's over-water activities) sometimes migrates to the Bay as airborne dust.[28] The dust originates from several sources around the Facility, including the stacker-reclaimer, the railcar unloader, and the coal stockpiles.[29]

According to both Defendants and DEC, the dust emissions are not subject to NPDES permitting requirements.[30] Rather, DEC regulates these dust emissions under Alaska's clean air regulations.[31] The Facility was cited twice, in 2007 and in 2008, for violating the State regulations.[32] As a result, the Facility paid a sizable civil penalty and agreed to implement a variety of measures to control the dust.[33] These control measures have reduced the dust emissions considerably, but have not eliminated the dust entirely.[34]

### 3. Coal–Contaminated Snow

Plaintiffs' final claim concerns the Facility's snow removal practices. Plaintiffs rely primarily on the declaration and deposition testimony of Russell Maddox ("Maddox"), a member of both Alaska Toxics and Sierra Club, to support this claim.[35] Maddox states that Aurora Energy intentionally plows coal-contaminated snow directly off of the dock into the Bay.[36] Plaintiffs also allege that Defendants unintentionally

24. Dkt. 120–15 at 7.

25. See, e.g., Dkt. 120–15 at 7.

26. Dkt. 125–1 at 4–8; Dkt. 120–23 at 16.

27. See, e.g., Dkt. 125–1 at 18, 27; Dkt. 120–21 at 1, 5.

28. Dkt. 106; Dkt. 120–24; Dkt. 120–25.

29. Dkt. 106; Dkt. 120–24; Dkt. 121–54.

30. See Dkt. 113 at 6–7; Dkt. 117.

31. Dkt. 116; Dkt. 117.

32. Dkt. 116 at 3.

33. Id.; Dkt. 121–32.

34. See, e.g., Dkt. 121–52.

35. See Dkt. 106.

36. Id.

discharge coal-contaminated snow from the loading dock when the snow falls from the sides or through the slats in the dock.[37] Finally, Plaintiffs (through Maddox) claim that Defendants plow coal-contaminated snow directly into wetlands and a pond north of the Facility.[38] Defendants do not dispute that the wetlands and pond fall within the CWA's definition of navigable waters. However, Defendants do dispute that any of the alleged snow-related discharges actually occur.[39]

### D. The Facility's NPDES Permit History

EPA issued the Facility its original individual NPDES permit in 1984.[40] In 1999, when it came time for the Facility to renew the permit, EPA advised the Facility that its discharges could be regulated under either an individual permit like the one it had, or under the NPDES Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activities ("General Permit" or "Permit").[41] EPA indicated that the "application, issuance, and maintenance of the General Permit" would "require[ ] a lower administrative burden to both EPA and the facility" and that, "since the General Permit [was] already written," renewal under the General Permit would save EPA from "having to prepare a new individual permit for [the]

facility."[42] In 2001, the Seward Facility switched from its individual NPDES permit to the General Permit.[43]

In 2009, the Facility renewed its General Permit.[44] As a prerequisite to coverage, the Facility was required to have developed and implemented a Storm Water Pollution Prevention Plan ("Prevention Plan" or "Plan").[45] The Prevention Plan implements and is an enforceable requirement of the General Permit.[46] The Plan documents potential pollutant sources, including materials handling activities such as storage, loading, unloading, transportation, and conveyance of materials.[47] The Plan also requires that the Facility implement a variety of control measures and good housekeeping measures to prevent pollutants from entering Resurrection Bay.[48]

In early February 2010, EPA and DEC conducted a site inspection of the Seward Facility.[49] The purpose of the inspection was to "ensure that water quality standards and permit requirements [were] being met."[50] A significant portion of the inspection report focuses on the coal that enters the Bay from the ship loader area and conveyer belt, and the coal dust the Facility generates.[51] No violations of the General Permit, the Prevention Plan, or water quality standards generally, were reported.[52] In August 2011, the Facility was inspected again.[53] Again, no violations

**37.** Dkt. 120 at 52.

**38.** *See* Dkt. 120 at 52–53 (citing Maddox Decl. at Dkt. 106).

**39.** *See* Dkt. 112 at 55–58; Dkt. 128 at 36–46.

**40.** Dkt. 121–47 at 2.

**41.** Dkt. 121–5.

**42.** Dkt. 121–5.

**43.** Dkt. 121–6.

**44.** *See* Dkt. 121–9.

**45.** Dkt. 121–8.

**46.** Dkt. 117 at 3.

**47.** Dkt. 120–4; Dkt. 117 at 3.

**48.** *See* Dkt. 120–4; Dkt. 117 at 3.

**49.** Dkt. 121–52.

**50.** Dkt. 120–20; *see also* Dkt. 121–52 at 1.

**51.** *See* Dkt. 121–52.

**52.** *See id.*

**53.** *See* Dkt. 121–54.

were reported.[54]

## III. LEGAL STANDARD

Summary judgment is warranted when the pleadings and the evidence in the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[55] An issue is genuine only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party, and material only if the fact may affect the outcome of the case.[56]

Generally, it is the moving party that must demonstrate it is entitled to summary judgment.[57] The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact.[58] Where the non-moving party has the burden at trial, however, the moving party is not required to produce evidence negating or disproving every essential element of the non-moving party's case.[59] Instead, the moving party's burden is met by pointing out that there is an absence of evidence supporting the non-moving party's claim.[60] The burden then shifts to the non-moving party to show that there is a genuine issue of material fact that must be resolved at trial.[61] The non-moving party must make an affirmative showing on all matters placed in issue by the motion as to which it has the burden of proof at trial.[62]

Where parties have filed cross-motions for summary judgment, "[e]ach motion must be considered on its own merits."[63] Accordingly, this Court would ordinarily address each party's summary judgment motion individually. However, in this case, the arguments set forth in the parties' summary judgment motions are the same as those set forth in their oppositions to the opposing parties' summary judgment motion. The Court will therefore address the motions together.

## IV. DISCUSSION

### A. Procedural Matters

Before addressing the merits of the parties' motions, the Court must first address two motions to strike, filed by the parties at Docket Nos. 132 and 137. For the reasons discussed below, these motions are DENIED.

#### 1. *Plaintiffs' Motion to Strike*

Plaintiffs move to strike Appendix A from Defendants' opposition to Plaintiffs' summary judgment motion.[64] "Appendix A" is a chart in which Defendants identify various factual assertions made by Plaintiffs in their summary judgment motion and explain why those factual assertions are not supported by the evidence.[65]

---

54. *See id.*

55. Fed.R.Civ.P. 56(c).

56. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

57. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Nissan Fire Marine Ins. Co. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir.2000).

58. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

59. *Id.*

60. *Id.*

61. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

62. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

63. *Fair Housing Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1135–36 (9th Cir.2001); *see also Shafer v. City of Boulder*, 896 F.Supp.2d 915, 927 (D.Nevada 2012).

64. Dkt. 137.

65. *See* Dkt. 128–1.

Plaintiffs, citing Local Rule 7.1., argue that the chart is not among the types of documents that may be attached to a summary judgment opposition.[66] Defendants, on the other hand, assert that the chart is part of their opposition and, because the chart and opposition together do not exceed their page allowance, the Court should not strike it.[67]

The Court need not resolve this dispute. The summary judgment rulings that follow are based primarily on factual, rather than legal, grounds. Because none of the information contained in Defendants' Appendix is material to the Court's rulings, Plaintiffs' motion to strike at Docket 137 is DENIED as moot.

### 2. *Defendants' Motion to Strike*

Defendants move to strike, on evidentiary grounds, numerous exhibits submitted by Plaintiffs in support of their summary judgment motion.[68] Defendants argue: (1) that various third-party statements are inadmissible hearsay; (2) that a number of photographs cannot be properly authenticated; and (3) that the declarations of Russell Maddox ("Maddox") and another witness are inconsistent with their deposition testimony and therefore should be stricken as "sham" affidavits.[69] As the Court just explained, the parties' summary judgment motions are resolvable largely on legal grounds and the majority of the evidence to which Defendants object is therefore immaterial to the Court's resolution of the summary judgment motions.

The Court therefore declines to address most of the challenges raised in Defendants' motion. However, the Court will address the parties' dispute concerning Maddox's statements because those statements are relevant to the Court's decision on Plaintiffs' third claim.

Maddox is Plaintiffs' primary witness in support of their summary judgment motion.[70] He is also a member of both Plaintiff Alaska Toxics and Plaintiff Sierra Club.[71] Defendants move to strike Maddox's declaration because, they assert, it is inconsistent with his prior sworn deposition testimony and therefore constitutes a "sham" affidavit.[72] Plaintiffs do not acknowledge the apparent inconsistencies in Maddox's statements, but argue that the "sham" affidavit rule does not apply here.[73]

■ "The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony."[74] The purpose of this rule is "to bar a plaintiff from creating a factual dispute with himself for the sole purpose of arguing that summary judgment is inappropriate until the dispute is settled."[75] However, because the rule "is in tension with the principle that a court's role in deciding a summary judgment motion is not to make credibility determinations or weigh conflicting evidence," the rule must be applied with caution.[76] Before a court may strike an affidavit under this rule, the "court must

**66.** Dkt. 137 at 2.

**67.** Dkt. 147 at

**68.** Dkt. 132.

**69.** Dkt. 132.

**70.** *See generally* Dkt. 120; Dkt. 106 (and attached photographs).

**71.** Dkt. 106 at 1.

**72.** Dkt. 132 at 5–7; Dkt. 143 at 8–12.

**73.** Dkt. 138 at 18–20.

**74.** *Kennedy v. Allied Mut. Ins. Co.,* 952 F.2d 262, 266 (9th Cir.1991).

**75.** *Nelson v. City of Davis,* 571 F.3d 924, 927–28 (9th Cir.2009).

**76.** *Van Asdale v. International Game Technology,* 577 F.3d 989, 998 (9th Cir.2009).

make a factual determination that the contradiction was actually a "sham." [77]

The inconsistencies cited in the motion to strike relate to Plaintiffs' claim that Defendants intentionally plow coal-contaminated snow into navigable waters. For example, at Maddox's January 31, 2012 deposition, Maddox stated that the last time he saw snow plowed from the dock was November 2011.[78] But, in his declaration in support of Plaintiffs' summary judgment motion, Maddox states that he saw Defendants plow snow over the edge of the dock in "*January*, February, and March of 2012." [79] Maddox also stated at his deposition that he was "just assum[ing]" that the snow contained coal because coal sometimes spilled onto the dock from the conveyer.[80] But, in his declaration, Maddox states that he saw Defendants plow "snow covered with coal-dust and coal spillage" directly from the dock into the Bay.[81]

Although these statements appear to be inconsistent, they are not impossible to reconcile. For example, if Maddox witnessed snow being plowed into the Bay on January 31, 2012, after his deposition, the statements regarding the dates would not be inconsistent. In any event, the Court declines to make a specific finding that Maddox's declaration is a "sham." The majority of Maddox's declaration is consistent with his prior testimony. To the extent inconsistencies exist, they raise issues concerning Maddox's credibility as a witness. Credibility determinations are to be made by the fact-finder at trial, not by the court on summary judgment.[82]

Accordingly, Defendants' motion to strike Maddox's declaration (Docket No. 132) is DENIED. And, for the reasons previously discussed, Defendants' remaining requests are also DENIED, as moot.

## B. Motions for Summary Judgment

As discussed above, Plaintiffs' three claims correspond to three ways in which they allege that Defendants have discharged and continue to discharge coal into Resurrection Bay. Plaintiffs move for summary judgment on each of their claims on the basis that these discharges are not authorized by an NPDES permit and therefore each constitutes a CWA violation.[83] Defendants move for summary judgment on the basis that each of the alleged discharges is either covered by their existing permit, subject to the protections of the CWA's permit shield provision, not regulated by the CWA, or is unproven by Plaintiffs.[84]

For the reasons discussed below, the Court finds that summary judgment in favor of Defendants is appropriate on Plaintiffs' first and second claims. The Court therefore denies Plaintiffs' motion for summary judgment on those claims. However, with respect to Plaintiffs' third claim, material issues of fact remain and

---

77. *Id.*

78. Dkt. 121–14 at 13–14.

79. Dkt. 106 at 11.

80. Dkt. 121–14 at 18.

81. Dkt. 106 at 11.

82. *Nelson,* 571 F.3d at 928.

83. Dkt. 120.

84. *See generally* Dkt. 112. Defendants also challenge Plaintiffs' ability to bring this action on the basis that Plaintiffs did not first exhaust their administrative remedies. Dkt. 112 at 30–31. The Court declines to address this argument in any detail because it is clear from the statute that the only prerequisite to Plaintiffs' bringing this citizen suit was sixty days notice to Defendants, EPA, and the State of Alaska. *See* 33 U.S.C. § 1365(b)(1)(A). Defendants do not dispute that Plaintiffs' complied with the statute's notice requirements prior to filing their complaint.

both parties' summary judgment motions are therefore denied.

### 1. Coal Discharges from Over–Water Conveyer and Ship Loader.

Plaintiffs' first claim is that Defendants, without an NPDES permit, have discharged and continue to discharge coal from the over-water conveyer and ship loading area into Resurrection Bay.[85] Defendants object to Plaintiffs' motion, and separately move for summary judgment on this claim, on the basis that these discharges are covered by the General Permit or, alternatively, that Defendants are protected from liability by the CWA's permit shield provision.[86]

The "CWA prohibits the discharge of any pollutant from a point source into navigable waters of the United States without an NPDES permit." [87] Defendants do not dispute that coal is a "pollutant," that Resurrection Bay constitutes "navigable waters," or that the conveyer belt and ship loading area from which coal falls into the Bay are "point sources." [88] The parties' disagreement concerns whether these discharges fall within the scope of discharges authorized by Defendants' existing permit.

█ A discharge in violation of the CWA is ordinarily a strict liability of-fense.[89] An NPDES permit, while placing limits on the pollutants that may be discharged, may also protect the permit holder from strict liability for unauthorized discharges through what is known as the "permit shield" defense, codified at 33 U.S.C. § 1342(k).[90] Section 1342(k) provides that "[c]ompliance with a permit issued pursuant to this section shall be deemed compliance" with various sections of the CWA, including the provisions prohibiting unpermitted discharges. Whether the permit shield defense applies necessarily depends on the scope of the permit.

█ The Fourth Circuit's decision in *Piney Run Preservation Association v. County Commissioners of Carroll County* is the seminal case addressing the scope of the CWA's permit shield provision.[91] In interpreting this provision, the Fourth Circuit applied the Supreme Court's two-part *Chevron* analysis.[92] At the first step, the court determined that the text of the permit shield provision was ambiguous.[93] At the second step, the court determined that EPA's Environmental Appeals Board had already reasonably interpreted the provision to apply to "pollutants that are not listed in [the] permit as long as [the party] only discharges pollutants that have been adequately disclosed to the permitting authority." [94] In other words, although a

85. *See* Dkt. 120 at 21–22.

86. Dkt. 112 at 22–28; Dkt. 128 at 15–18.

87. *Northwest Envtl. Advocates v. EPA*, 537 F.3d 1006, 1010 (9th Cir.2008) (quoting *N. Plains Res. Council*, 325 F.3d at 1160); *see also* 33 U.S.C. §§ 1311(a), 1342.

88. *See generally* Dkt. 112 at 22–28; Dkt. 128 at 15–18.

89. *Santa Monica Baykeeper v. Kramer Metals, Inc.*, 619 F.Supp.2d 914, 919 (C.D.Cal.2009); *Save Our Bays and Beaches v. City and Cnty. of Honolulu*, 904 F.Supp. 1098, 1105 (D.Haw. 1994).

90. *See Piney Run Pres. Assoc. v. Cnty. Commis. of Caroll Cnty., Md.*, 268 F.3d 255, 267 (4th Cir.2001).

91. *Id.*

92. *Id.* at 266 (applying *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

93. *Id.* at 267 (citing *Atlantic States Legal Found. v. Eastman Kodak Co.*, 12 F.3d 353, 357–58 (2d Cir.1994)).

94. *Id.* at 267–68 (citing *In re Ketchikan Pulp Co.*, 7 E.A.D. 605, 1998 WL 284964 (A.P.A. 1998)).

permit holder "is liable for any discharges not in compliance with its permit," the court recognized that EPA intended compliance to be "a broader concept than merely obeying the express restrictions set forth on the face of the NPDES permit." [95] Accordingly, any discharge that has been adequately disclosed to the permitting authority, and is not expressly prohibited by the permit, is considered to be within the scope of the permit's protection. [96]

With these principles in mind, the Court turns to the permit and coal discharges at issue in this case.

█ The Seward Facility's General Permit is a general, non-facility-specific permit that authorizes stormwater discharges for a variety of industrial operations. [97] The General Permit expressly authorizes the permit holder to discharge several categories of "stormwater," [98] which is defined as "storm water runoff, snow melt runoff, and surface runoff and drainage." [99] The General Permit also authorizes several specified categories of "non-stormwater discharges," which are primarily unpolluted discharges and discharges associated with emergency services activities. [100] The General Permit does not, by its plain language, authorize non-stormwater discharges of coal into Resurrection Bay.

Defendants assert that the coal discharges are expressly authorized by the General Permit because they are contemplated in the Facility's Prevention Plan. [101]

But this argument ignores the fact that the General Permit *requires* that Defendants describe in their Prevention Plan all "non-stormwater discharge(s) and source locations" and the control measures the Facility has implemented to eliminate those discharges. [102] Because Defendants were required to include this information in the Prevention Plan regardless of whether the coal discharges were authorized by the General Permit, Defendants cannot rely solely on the Prevention Plan, absent corresponding authorization in the Permit itself, as evidence that the discharges are expressly allowed by the Permit.

The Court concludes that Defendants' permit does not expressly allow non-stormwater discharges of coal into the Bay. However, the coal discharges are nonetheless "within the scope of the permit's protection" as long as: (1) Defendants have complied with the express terms of their existing permit—i.e., the General Permit does not "specifically bar [ ]" the coal discharges; and (2) the discharges were adequately disclosed to, and reasonably anticipated by, the permitting authority during the permitting process. [103] As discussed below, the Court finds that the coal discharges are not specifically prohibited by the General Permit and that they were adequately disclosed to and reasonably anticipated by EPA.

---

**95.** *Id.* at 269.

**96.** *Id.*

**97.** *See generally* Dkt. 120–1.

**98.** Dkt. 120–1 at 6.

**99.** 40 C.F.R. § 122.26(b)(13). Stormwater discharges associated with industrial activity are defined as "discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant." 40 C.F.R. § 122.26(b)(14).

**100.** *See* Dkt. 120–1 at 7–8.

**101.** *See* Dkt. 112 at 25.

**102.** Dkt. 120–1 at 33.

**103.** *Piney Run,* 268 F.3d at 266, 269; *see also* 33 U.S.C. § 1342(k).

a. *The General Permit Does Not Specifically Prohibit the Coal Discharges from the Conveyer and Ship Loader.*

The CWA's permit shield provision protects a permit holder who complies with the express terms of its permit from liability for discharges *not* expressly authorized in the permit, as long as the discharges were not "specifically barred" by the permit.[104] The Court analyzes an NPDES permit in the same manner it would interpret a contract or other legal document.[105] In doing so, the Court begins with the plain language of the permit provisions, and must interpret each provision with reference to the entire permit.[106] Where a provision is ambiguous, the Court "look[s] to extrinsic evidence to determine the correct understanding of the permit." [107]

The Seward Facility's General Permit authorizes specific categories of "stormwater discharges." [108] Section 1.1.3 of the General Permit describes several types of "allowable non-stormwater discharges," none of which includes coal.[109] The permit, in Section 2.1.2.10, also requires Defendants to "eliminate non-stormwater discharges not authorized by an NPDES permit" and refers the permit holder to Section 1. 1.3 for a list of "authorized" non-stormwater discharges.[110] Plaintiffs

argue that these provisions amount to an express prohibition against Defendants' coal discharges. Specifically, Plaintiffs contend that the list of "allowable non-stormwater discharges" is exhaustive and that all other non-stormwater discharges are implicitly "prohibited" by the Permit.[111] Defendants, on the other hand, argue that the list of allowable non-stormwater discharges is non-exhaustive.[112] The Court agrees with Defendants that, when the Permit is viewed in its entirety, it cannot be strictly construed as prohibiting all non-stormwater discharges not listed in Section 1.1.3.

The facts here are similar, although not entirely analogous, to the facts in *Piney Run,* the seminal case on the permit shield defense.[113] In *Piney Run,* an environmental organization challenged a county-run treatment plant's discharge of heat into a local stream as an illegal discharge not covered by an NDPES permit.[114] The County's permit listed a number of pollutants which the plant was authorized to discharge, but it did not list heat.[115] The permit also contained a footnote, which stated that the "discharge of pollutants not shown shall be illegal." [116] The Fourth Circuit concluded that the footnote was ambiguous because it did not indicate where or to whom the pollutants must "be shown" in order to fall within the scope of the permit.[117] The court then analyzed

**104.** *Id.* at 259, 268–69 (citing *Ketchikan,* 7 E.A.D. 605, 1998 WL 284964).

**105.** *See Northwest Environmental Advocates v. City of Portland,* 56 F.3d 979, 982 (9th Cir. 1995); *Piney Run,* 268 F.3d at 269.

**106.** *See Doe 1 v. AOL LLC,* 552 F.3d 1077, 1081 (9th Cir.2009) (each part of a contract is read with reference to the whole); *Piney Run,* 268 F.3d at 270 (an NPDES permit provision should be examined in the context of the entire permit).

**107.** *Piney Run,* 268 F.3d at 270.

**108.** Dkt. 120–1 at 6.

**109.** *See* Dkt. 120–1 at 7–8.

**110.** Dkt. 120–1 at 20.

**111.** Dkt. 127 at 13–15, 19; Dkt. 139 at 10.

**112.** *See, e.g.,* Dkt. 140 at 10–11.

**113.** *See* 268 F.3d 255.

**114.** *Id.* at 259–62.

**115.** *Id.* at 260–61.

**116.** *Id.* at 269.

**117.** *Id.* at 270.

the footnote in the context of the entire document and concluded that other parts of the permit contemplated that additional discharges might occur.[118] Based on this analysis, the court determined that the footnote making it "illegal" to discharge pollutants "not shown" applied only to pollutants "not disclosed" to the permitting authority.[119] Because heat was not "specifically barred" by the permit, and because the heat discharges had been adequately disclosed to the permitting authority, the defendants were shielded from liability.[120]

Unlike the permit at issue in *Piney Run,* the Seward Facility's permit contains no express clause making it "illegal" to discharge non-stormwater substances not specifically listed in Section 1.1.3 ("allowable non-stormwater discharges"). Section 2.1.2.10 of the Permit does, however, require permit holders to "eliminate" pollutants not "authorized," and refers the permit holder to Section 1. 1.3 for a list of "authorized" non-stormwater discharges. Section 2.1.2.10 could therefore be reasonably interpreted to mean that non-stormwater discharges not listed in Section 1.1.3 are barred.

Although this interpretation would be reasonable, it is not the only reasonable interpretation. Section 2.1.2.10 indicates that Section 1.1.3 contains a list of "authorized" non-stormwater discharges, but neither section expressly states that the Section 1.1.3 discharges are the *only* non-stormwater discharges that may be "authorized." This leaves open the possibility that other non-stormwater discharges could be authorized under the Permit. Because the General Permit does not indicate the manner in which non-stormwater discharges must be "authorized" to be covered under the permit, and the permit's provisions could reasonably be interpreted in more than one way, the Court finds that the provisions are ambiguous.

Moreover, like the permit in *Piney Run,* the language in other sections of the General Permit tends to indicate that Section 1.1.3 was not intended as an express prohibition against all unlisted non-stormwater discharges. The Seward Facility's General Permit for stormwater discharges is a generic permit (i.e., not specific to the Seward Facility) that is issued to a variety of industrial facilities either by EPA or by state agencies with delegated authority.[121] The General Permit sets forth requirements generally applicable to all industrial categories covered by the Permit and, in a series of sub-sections, sets forth specific requirements, restrictions, and authorizations applicable to specific industries.[122] Each industrial category is given a "sector" designation.[123] The Seward Facility is designated as Sector AD.[124] Sector AD is a catch-all category encompassing facilities that do not otherwise fit within the General Permit's specific categories.[125] The Prevention Plan requirements for Sector AD "are the same as in the baseline general permit to ensure flexibility given the broad universe of potential types of facilities which may be covered."[126] Unlike other sectors, the Seward Facility has no re-

---

**118.** *Id.*

**119.** *Id.* at 270–71.

**120.** *Id.*

**121.** *See* Dkt. 120–1; *see also* Dkt. 121–5 (EPA letter describing the general permit as a prewritten document not prepared specifically for the Seward Facility).

**122.** *See generally* Dkt. 120–1.

**123.** *See* Dkt. 120–1 at 47–139.

**124.** *See* Dkt. 121–9.

**125.** *See* Dkt. 120–1 at 144; *see also* 63 Fed. Reg. 52430, at *52443 (September 30, 1998).

**126.** 63 Fed.Reg. 52430, at *52443.

quirements or restrictions beyond those generally applicable to all sectors.[127] Consequently, the only permit conditions specific to the Seward Facility are those found in its Prevention Plan.

Sector AD facilities such as the Seward Facility are the exception, not the rule. Every other sector is subject to additional General Permit requirements, restrictions, and authorizations. For example, Sector A encompasses "timber products."[128] In addition to the "allowable non-stormwater discharges" listed in Section 1.1.3 of the General Permit, Sector A facilities are also authorized to discharge limited "non-stormwater" discharges associated with "the spray[ing] down of lumber and wood product storage yards [.]"[129] The fact that the General Permit contemplates, for Sector A facilities, non-stormwater discharges different from those listed in Section 1.1.3 indicates that Section 1.1.3 was not intended to be an exhaustive list.

In addition to contemplating other non-stormwater discharges, the General Permit also expressly prohibits specific types of non-stormwater discharges for certain sectors. For example, Sector C facilities ("chemical and allied products manufacturing, and refining") are expressly prohibited from discharging "non-stormwater discharges containing inks, paints, or substances (hazardous, nonhazardous, etc.) re-

sulting from an onsite spill[.]"[130] Other sectors are subject to similarly individualized restrictions on non-stormwater discharges.[131] If Section 1.1.3 is an exhaustive list, these individualized prohibitions would be unnecessary.

The purpose of the permit shield is to protect permit holders from liability for unauthorized discharges as long as those discharges are not "specifically barred" by the existing permit, provided the other permit shield conditions exist. If EPA had intended that the General Permit prohibit every non-stormwater discharge not listed in Section 1.1.3, it easily could have added a provision to that effect. Instead, the Permit, in another section, contemplates non-stormwater discharges that are not listed in Section 1.1.3, and in other sections, individually prohibits specific non-stormwater discharges. This indicates to the Court that the list of discharges in Section 1.1.3 was not intended to strictly prohibit all unlisted non-stormwater discharges. This does not mean that the coal discharges at the Seward Facility are automatically authorized by the General Permit; just that they are not "specifically barred" by any permit provision.[132]

Plaintiffs do not dispute that Defendants have otherwise complied with the express terms of their existing permit.[133] Having

---

**127.** *See* Dkt. 120–1 at 144. However, the regulatory agency has the authority, if it wishes, to establish additional requirements for Sector AD facilities. *Id.*

**128.** Dkt. 120–1 at 47.

**129.** *Id.*

**130.** Dkt. 120–1 at 51.

**131.** *See* Dkt. 120–1 at 61, 71, 87, 91, 97, 110.

**132.** Plaintiffs also cite 40 C.F.R. § 122.28(2) to argue that the coal discharges cannot be allowed under the General Permit because

EPA regulations do not authorize permitting authorities to cover both stormwater and non-stormwater discharges under the same permit. Dkt. 127 at 15. This argument is contrary to the plain language of the cited regulation, which provides, in relevant part, that a general permit may regulate "one or more categories or subcategories of discharges ... where the *sources* within a covered subcategory of discharges are ... storm water point *sources.*" 40 C.F.R. 122.28(2)(i) (emphasis added).

**133.** *See* Dkt. 165 at 14 (oral argument testimony in which Plaintiffs state that their lawsuit "is not a challenge that the Facility is violating its stormwater permit").

concluded that the coal discharges are not explicitly prohibited by the permit, the Court turns to whether the discharges were adequately disclosed to, and reasonably anticipated by, the permitting authority.

### b. *The Coal Discharges Were Adequately Disclosed to and Reasonably Anticipated by the Permitting Authority.*

Where a permit holder is in compliance with the express terms of its existing NPDES permit, the permit holder is shielded from liability for unpermitted discharges that were both "adequately disclosed" during the permitting process and "reasonably anticipated by" the permitting authority.[134] If "these conditions are satisfied, then [defendants] are protected by the permit shield defense and they are not liable under the CWA."[135] As discussed below, the Court finds that EPA was aware of the discharges and reasonably anticipated their coverage under the General Permit.

### i. The Discharges were Adequately Disclosed to EPA.

The Court finds that Defendants adequately disclosed the coal discharges to EPA during the permitting process. In 2009, the Facility filed its Notice of Intent to renew the General Permit.[136] On May 15, 2009, EPA acknowledged receipt of the Notice and indicated that coverage under the General Permit would begin on June 14, 2009, following a thirty-day waiting period.[137] Both the General Permit and EPA's May 15, 2009 letter indicate that Defendants were required to prepare and implement a Prevention Plan as a prerequisite to coverage.[138] The Prevention Plan implements and is an enforceable component of the Permit.[139] EPA received the Prevention Plan in May 2009, prior to the June 14, 2009 effective coverage date.[140] The Plan was therefore submitted "during the permitting process."

The Prevention Plan separates the Facility into several "drainage areas."[141] The Plan identifies the "conveyer over water and ship loader" as "Drainage Area H," and identifies "coal" as the suspected pollutant that enters the Bay.[142] Under the Plan, Defendants were required to implement the following measures to control the amount of coal that enters the Bay: (1) "cover[s]" over the conveyer; (2) "wipers on [the] conveyer belt to reduce coal carry back on the return belt"; (3) "chute modifications to reduce coal spillage"; (4) seal replacement on the conveyer to "minimize spillage from [the] sides of the [conveyer] belt"; (5) seals "at transfer points" to "keep the coal on the belt as it is being loaded"; and (6) proper conveyer maintenance "to minimize the amount of coal escaping from the conveyer."[143] These requirements appear in two separate sections of the Prevention Plan and are intended to prevent coal discharges while "the conveyer [is] deliver[ing] coal from the stockpile to [the] ships."[144] Regardless of whether EPA reasonably contemplated that the coal discharges would be covered by the General Permit, it is clear

---

134. *Piney Run*, 268 F.3d at 268 (citing *Ketchikan*, 7 E.A.D. 605, 1998 WL 284964).

135. *Id.* at 271.

136. Dkt. 121–8

137. Dkt. 121–8.

138. Dkt. 120–1; Dkt. 121–8.

139. Dkt. 117 at 3.

140. *See* Dkt. 121–11 at 11.

141. *Id.*

142. *Id.*

143. *Id.* at 11, 15.

144. *See id.* at 11, 15, 20.

that the discharges were "adequately disclosed" to the agency "during the permitting process." [145]

ii. The Discharges were Reasonably Anticipated by EPA.

The Court further concludes that EPA reasonably anticipated these discharges during the permitting process. Plaintiffs speculate that EPA may not have reviewed the Prevention Plan before the permit went into effect, but Defendants submitted the Plan at least two weeks before the effective date of coverage and Plaintiffs offer no evidence to support this assertion. More importantly, and as discussed below, Defendants have presented substantial circumstantial evidence, from both before and after the permit was issued, that indicates EPA reasonably anticipated these discharges.

The Court recognizes that disclosure of the discharges in the Prevention Plan is not, by itself, sufficient to establish that EPA reasonably contemplated that the discharges would be covered under the General Permit. As noted earlier, the General Permit required disclosure of all non-stormwater discharges regardless of whether they were authorized by the Permit.[146] However, EPA's history with the Facility, and EPA's (and DEC's) actions and statements soon after the General Permit was issued, indicate that EPA did, at the time the permit was issued, reasonably anticipate that the discharges would be regulated under the General Permit and Prevention Plan.

DEC took over NPDES permitting for Alaska in late 2009.[147] In early February 2010, less than eight months after EPA issued the Permit, inspectors from both EPA and DEC conducted a site inspection of the Facility to verify compliance with the Permit and Prevention Plan.[148] No violations were noted in the inspection report.[149] Plaintiffs assert that inspectors whose purpose it was to ensure compliance with a "stormwater" permit would not have been looking for other types of discharge violations. Therefore, they argue, the fact that Defendants were found to be in compliance with their stormwater permit is irrelevant to whether Defendants were discharging non-stormwater in violation of the CWA. But, this argument ignores the fact that a significant portion of the 2010 inspection report is directly focused on the coal spills and coal dust discharged from the conveyer and ship loading area.[150] That is, the inspection and inspectors were focused substantially on non-stormwater discharges.

In the 2010 report, the inspectors discuss the measures the Facility has taken "to reduce coal spillage." [151] The report also documents the inspectors' observations that the dock along the conveyer was coated in coal dust, that coal dust had accumulated below the conveyer, and that there were coal chunks and coal dust on the dock below the ship loader.[152] The report also indicates that the inspectors watched "flakes of carry-back coal," both from the conveyer and ship loader, fall into the Bay, and that an inspector walked along the beach to ascertain whether "coal or coal debris" was "falling from the conveyer." [153] The final pages of the report,

---

145. *See Piney Run,* 268 F.3d at 269.

146. *See* Dkt. 120–1 at 33.

147. Dkt. 117 at 2.

148. *See* Dkt. 120–52.

149. *See id.*

150. *See generally* Dkt. 120–52.

151. *Id.* at 2.

152. *Id.* at 3

153. *Id.* at 3.

titled "Areas of Concern" and "Action Items," discuss almost exclusively the coal discharges resulting from "dust generation and coal spillage" during the ship loading process.[154] Referring to these discharges, the report notes that, "although the amounts of these pollutants being generated appear to have been substantially reduced, there is still room for improvement."[155] The only action required of the Facility following the inspection was that it "[c]onduct research to determine if any additional control measures exist in similar industries, which might be implemented to further reduce carry-back and spillage of coal during the transfer process."[156]

These actions and statements by EPA and DEC, made shortly after EPA issued the General Permit, indicate that the discharges were not only "reasonably contemplated" by EPA, but were actively regulated by the agencies under the General Permit. This conclusion is also consistent with the Facility's permitting history. It is clear that EPA knew for years prior to receiving the May 2009 Prevention Plan that coal regularly falls into Resurrection Bay during the coal-loading process. In a 1987 dive inspection report, EPA discovered a significant amount of coal (thirty centimeters deep in some places) covering the ocean floor beneath the conveyer and dock.[157] The report explains that the coal "probably spilled from the loading conveyer belt."[158] EPA attached this dive report to a 1988 inspection report, in which EPA found the Facility to be in compliance with its former permit.[159]

In 1999, EPA informed the facility in a letter that its discharges could either be regulated under the facility's then-existing individual permit or under the General Permit for stormwater.[160] In the same letter, EPA encouraged the Facility to switch to the General Permit, in part, because not having to draft a facility-specific permit would create less of an "administrative burden" on EPA.[161] Thereafter, the Facility switched to the General Permit.[162] This history, combined with the agencies' recent active regulation of the discharges under the General Permit, convinces the Court that EPA reasonably anticipated, at the time the permit was renewed in 2009, that these discharges would be regulated under the General Permit and accompanying Prevention Plan.

Furthermore, although DEC did not take over the NPDES permitting program from EPA until several months after the General Permit was issued, DEC's recent statements regarding coverage of these discharges under the General Permit are consistent with the Court's decision. The DEC Deputy Commissioner states that the coal discharges are covered by the Facility's General Permit and that no additional permit is necessary to comply with the CWA.[163] The Deputy Commissioner also states that "requiring an individual NPDES[ ] permit, rather than the current coverage under the [General Permit], would be duplicative and needlessly cumbersome (both for [ ]DEC and the permittee)" and "would provide no additional environmental benefit or protection."[164] Finally, DEC indicates

154. Dkt. 121–52 at 4.

155. *Id.*

156. *Id.*

157. Dkt. 121–4.

158. *Id.*

159. *See* Dkt. 121–3.

160. Dkt. 121–5.

161. *Id.*

162. Dkt. 121–6.

163. Dkt. 117.

164. *Id.* at 5.

that it "does not require, and has no current plans to require, a separate, individual NPDES[ ] permit for these discharges."[165]

Application of the permit shield defense does not require that Defendants prove conclusively that EPA intended to cover the coal discharges from the conveyer and ship loader under the General Permit. Rather, Defendants are entitled to the protections of the CWA's permit shield provision if, assuming they are otherwise in compliance with the General Permit, they "adequately disclosed" the discharges to EPA during the permitting process and the discharges were "reasonably anticipated" by EPA. The totality of the evidence presented by the parties indicates that the regulatory agencies not only knew about the discharges, but, in fact, actively regulated them under the existing Permit. Defendants are therefore "shielded" from liability for these discharges and judgment in their favor is warranted on Plaintiffs' first claim.

This decision should not be construed as an opinion—and the Court offers no opinion—on whether coverage of these discharges under the General Permit is generally appropriate. The Court finds only that the evidence presented in support of the parties' summary judgment motions establishes that the coal spills and coal dust created during the transfer of coal

from the shore to the ships were both disclosed to and reasonably contemplated by the EPA.

## 2. Discharge of Airborne Coal Dust into Resurrection Bay.

Plaintiffs next claim that Defendants violate the CWA each time coal dust is blown by the wind into the Bay from the Facility's coal stockpiles, stacker-reclaimer, and railcar unloader.[166] Defendants, in both their opposition to Plaintiffs' summary judgment motion and in their own summary judgment motion, assert that the coal carried to the Bay as airborne dust does not violate the CWA because it is not a "point source" discharge.[167] The Court agrees that the coal blown into the Bay as airborne dust is not a point source discharge and is therefore exempt from NPDES permitting requirements. Because Defendants are entitled to summary judgment on this basis, the Court declines to address Defendants' alternative arguments.[168]

"The CWA prohibits the discharge of any pollutant from a point source into navigable waters of the United States without an NPDES permit."[169] "Discharge of a pollutant" is "defined broadly"[170] to mean "any addition of any pollutant to navigable waters from any *point source*."[171] The CWA defines "point source" as:

---

165. *Id.*

166. *See* Dkt. 120 at 43. Plaintiffs also cite the conveyer and ship loader as sources of coal dust that ends up in the Bay. However, these are among the discharges that were disclosed to, contemplated by, and regulated by EPA. Defendants are therefore shielded from liability, pursuant to 33 U.S.C. § 1342(k), for coal dust that enters the Bay from those sources.

167. Dkt. 112 at 39–47; Dkt. 128 at 25–30.

168. Defendants alternatively argue that: (1) airborne dust emissions are regulated by the Clean Air Act, not the Clean Water Act; and

(2) even if the dust emissions were regulated by the CWA, the coal dust is covered by Defendants' existing permit. Dkt. 128 at 30; Dkt. 112 at 35.

169. *N. Plains Res. Council*, 325 F.3d at 1160 (citing 33 U.S.C. §§ 1311(a), 1342); *see also Northwest Envtl. Advocates*, 537 F.3d at 1010.

170. *Rapanos*, 547 U.S. at 723, 126 S.Ct. 2208.

171. 33 U.S.C. § 1362(12) (emphasis added); *Miccosukee Tribe*, 541 U.S. at 102, 124 S.Ct. 1537.

any *discernible, confined and discrete conveyance,* including but not limited to *any pipe, ditch, channel, tunnel, conduit,* well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. [. . .][172]

All other sources of pollution—i.e., pollution that does not reach the water through a "discernible, confined and discrete conveyance"—is "nonpoint source" pollution.[173] Nonpoint source pollution is "generally excluded from CWA regulations" and is left to the states to regulate through their own tracking and targeting methods.[174] The reason for this is, in part, because "nationwide uniformity in controlling non-point source pollution [is] virtually impossible" and, in part, because Congress is reluctant "to allow extensive federal intrusion into areas of regulation that might implicate land and water uses in individual states."[175]

Although nonpoint source discharges are exempt from NPDES permitting requirements, the CWA does not define "nonpoint source" pollution.[176] Congress left this task to EPA, which has published guidelines explaining that:

[nonpoint source pollution] is caused by diffuse sources that are not regulated as point sources and normally is associated with agricultural, silviculteral, urban runoff, runoff from construction activities, etc. Such pollution results in human-made or human-induced alteration of the chemical, physical, biological, and radiological integrity of water. In practical terms, nonpoint source pollution does not result from a discharge at a specific, single location (such as a single pipe) but generally results from land runoff, precipitation, *atmospheric deposition,* or percolation.[177]

The majority of the case law distinguishing point source from nonpoint source pollution does so in the context of stormwater runoff. These cases explain that runoff "that is not collected or channeled and then discharged, but rather runs off and dissipates in a natural and unimpeded manner, is not a discharge from a point source[.]"[178] Conversely, when runoff is "collected in a system of ditches, culverts, and channels and is then discharged into a stream or river, there is a discernible, confined and discrete conveyance of pollutants, and there is therefore a discharge from a point source."[179]

---

**172.** 33 U.S.C. § 1362(14) (emphasis added).

**173.** *Or. Natural Desert Ass'n v. U.S. Forest Serv.,* 550 F.3d 778, 780 (9th Cir.2008).

**174.** *Id.* at 785; *see also Oregon Natural Desert Ass'n v. Dombeck,* 172 F.3d 1092, 1096 (9th Cir.1998) (the CWA "provides no direct mechanism to control nonpoint source pollution but rather uses the threat and promise of federal grants to the states to accomplish this task") (citation and internal quotations omitted).

**175.** *See id.* (citing Poirier, *Non-point Source Pollution,* ENV'L L. PRACTICE GUIDE § 18.1 (2008)).

**176.** *Id.; see also Or. Natural Res. Council v. U.S. Forest Serv.,* 834 F.2d 842, 849 n. 9 (9th Cir.1987) ("Nonpoint source pollution is not

specifically defined in the Act, but is pollution that does not result from the 'discharge' or 'addition' of pollutants from a point source.").

**177.** EPA Office of Water, *Nonpoint Source Guidance* 3 (1987) (emphasis added).

**178.** *Northwest Environmental Def. Ctr. v. Brown,* 640 F.3d 1063, 1070–71 (9th Cir. 2011), rev'd on other grounds, *Decker v. Northwest Environmental Center,* —— U.S. ——, 133 S.Ct. 1326, 185 L.Ed.2d 447 (2013), (citing *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren,* 309 F.3d 1181, 1184 (9th Cir.2002)).

**179.** *Id.*

Plaintiffs argue that these principles apply only in the context of stormwater runoff and that, absent precipitous events, the only prerequisite to establishing a point source discharge is the ability to trace the pollutant back to a single, identifiable source.[180] But this argument is not supported by the law, which clearly establishes that "point sources are not distinguished by the kind of pollution they create or by the activity causing the pollution, but rather by *whether the pollution reaches the water through a confined, discrete conveyance.*"[181] In short, Plaintiffs' position is contrary to the CWA's unambiguous definition of "point source."

As the Court previously described, a "point source" is a "*conveyance.*"[182] "Conveyance" is defined by both ordinary and legal dictionaries as a "means of transport" or the act of taking or carrying something from one place to another.[183] Consequently, the Seward Facility's coal piles, stacker-reclaimer, and railcar unloader, no matter how easily they are identified as the original sources of coal dust blown into the Bay, cannot by themselves constitute "point sources" where there is no "discernible, confined and discrete conveyance" of the dust from those sources to the water.[184] To find otherwise would require the Court to ignore clear statutory language.[185]

This is not to say that coal piles and similar amassments cannot cause a point source discharge where the coal or other pollutant travels from the pile to the water through a "point source," as that term is defined by the CWA. For example, in *Sierra Club v. Abston Construction Company*, the Fifth Circuit found a point source discharge where runoff from highly erodible piles of strip mining waste was carried through naturally occurring ditches to nearby waters.[186] Similarly, in *Parker v. Scrap Metal Processors, Inc.*, the Eleventh Circuit found a point source discharge where runoff from piles of scrap metal debris was carried to the water through erosion gullies.[187]

Conversely, in *Greater Yellowstone Coalition v. Lewis*, the Ninth Circuit held that waste rock pits were not point sources within the meaning of the CWA because seepage from the pits that eventually made its way to surface waters was "not collected or channeled."[188] Likewise, in *Ecological Rights Foundation v. Pacific Gas & Electric Co.*, a California district court dismissed allegations that chemical

---

180. *See* Dkt. 120 at 32–34; Dkt. 127 at 47–50; Dkt. 139 at 19–20.

181. *Brown*, 640 F.3d at 1071 (quoting *Trustees for Alaska v. EPA*, 749 F.2d 549, 558 (9th Cir.1984) (citing *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 373 (10th Cir.1979)) (emphasis in original)).

182. *See* 33 U.S.C. § 1362(14); *Miccosukee Tribe*, 541 U.S. at 102, 124 S.Ct. 1537.

183. *See, e.g.*, Black's Law Dictionary (9th ed. 2009) (defining "conveyance"); Webster's II New College Dictionary (2001) (defining "convey" and "conveyance").

184. *See, e.g.*, *Brown*, 640 F.3d at 1071; *Trustees for Alaska*, 749 F.2d at 558 (9th Cir.1984); *Earth Sciences*, 599 F.2d at 373 (all indicating that point sources are distinguished from nonpoint sources by whether the pollution *reaches the water through a confined, discrete conveyance* ).

185. *See League of Wilderness Defenders*, 309 F.3d at 1185–86 (because the CWA point source definitions are "clear and unambiguous" the court must "read the regulation to conform to the statute and to the common understanding of the difference between point source and nonpoint source pollution").

186. 620 F.2d 41, 45–46 (5th Cir.1980).

187. 386 F.3d 993, 1009 & n. 17 (11th Cir. 2004).

188. 628 F.3d 1143, 1153 (9th Cir.2010).

pollutants from the defendant's utility poles were illegally discharged via stormwater runoff into San Francisco Bay because the plaintiffs did not show that the chemicals "reache[d] the water through a confined, discrete conveyance." [189]

Plaintiffs rely, in part, on the Second Circuit's decision in *Concerned Area Residents for Environment v. Southview Farm*, [190] to support their position that, absent rainfall, a point source is any singularly identifiable "source" of pollution. [191] In *Southview Farm*, the plaintiffs argued that the defendant's liquid manure spreading operations on its dairy farm were a "point source" from which pollutants were discharged into a nearby river. [192] The liquid manure was spread by tanker trucks over fields, after which some of the manure flowed into a swale on the property. [193] From the swale, the manure flowed through a pipe, which led to a ditch, which led to a stream that fed into the river. [194] The defendants argued that the manure-spreading facilities were not "point sources" because the pollutants naturally flowed to the swale and reached the river "in too diffuse a manner to create a point source discharge." [195] The court disagreed, concluding that, even if the flow from the fields into the swale could be characterized as diffuse runoff, the pollutant was thereafter collected in the swale and sufficiently channeled to constitute a discharge from a point source. [196] The court alternatively found that the tanker trucks themselves were point sources because they were used to collect the manure and discharge it onto the fields, after which it directly flowed (via the swale, pipe, and stream) into the river. [197]

In their briefing, Plaintiffs assert that the Second Circuit in *Southview Farm* "rejected" any channelization requirement "in the absence of rainfall." [198] And, at oral argument, Plaintiffs asserted that the Second Circuit "didn't care" how the pollutant reached the water as long as the source was identifiable. [199] These assertions are simply not accurate. The Second Circuit's point source determinations in *Southview Farm* were based largely on the fact that, after the manure was collected, either in the tanker trucks or subsequently in the swale, the manure was channelized through a pipe, ditch, and stream, directly into navigable waters. [200] If anything, *Southview Farm* indicates that, regardless of whether the discharge results from rainfall or some other event, the discharge is "from [a] point source" only if the pollutant reaches the water by way of a "discernible, confined and discrete conveyance." [201]

Moreover, several years after deciding *Southview Farm*, the Second Circuit, in *Cordiano v. Metacon Gun Club, Inc.*, spe-

---

**189.** 803 F.Supp.2d 1056, 1063 (N.D.Cal.2011) (quoting *Trustees for Alaska*, 749 F.2d at 558).

**190.** 34 F.3d 114 (2d Cir.1994).

**191.** *See* Dkt. 139 at 20; Dkt. 165 at 13.

**192.** 34 F.3d 114.

**193.** *Id.* at 118–119.

**194.** *Id.*

**195.** *Id.* at 118.

**196.** *Id.* at 118–19.

**197.** *Id.*

**198.** Dkt. 139 at 20.

**199.** Dkt. 165 at 13.

**200.** *See* 34 F.3d at 118–119; *see also Cordiano v. Metacon Gun Club*, 575 F.3d 199, 223–24 (2d Cir.2009) (discussing *Southview Farm* and explaining that the point source findings in that case were based on the fact that the manure was "channelized" directly into navigable waters).

**201.** 33 U.S.C. §§ 1362(12), 1362(14).

cifically rejected an argument that "wind-blown pollutants from any identifiable source, whether channeled or not, are subject to the CWA permit requirement."[202] In *Cordiano*, a shooting range was sued for discharging lead munitions into bordering wetlands without a permit.[203] The plaintiffs in *Cordiano* argued, among other things, that the berm into which bullets were fired was a point source because the wind carried lead dust from the berm to the wetlands.[204] Rejecting this argument, the court stated that "[t]he berm [could] not be described as a 'discernible, confined and discrete conveyance' *with respect to lead that is carried by the wind* [.]"[205] Consequently, any lead "that migrate[d] to jurisdictional wetlands as airborne dust d[id] not constitute a discharge from a point source."[206]

Apart from *Cordiano*, there are few cases that address point source discharges in the context of airborne pollution. The handful of cases that do exist address the issue in the context of pesticide spraying. Plaintiffs rely heavily on three of these cases—*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*,[207] *Peconic Baykeeper, Inc. v. Suffolk County*,[208] and *No Spray Coalition, Inc. v. City of New York*[209]—to argue

that aerial spraying of pesticides is analogous to windblown coal dust.[210] However, these cases do not support Plaintiffs' claim. In each of the cases, the courts found that pesticides *channeled through a spraying apparatus* on a truck or plane, when sprayed *directly over water*, met the statutory definition of a point source discharge.[211] As pointed out by the Southern District of New York in *No Spray Coalition*, there is no difference between "a sprayer releasing a fine mist of pollutant into the atmosphere *over the water* and a pipe that release[s] the same flow of pollutant directly into water."[212] The spraying apparatus and pipe are both "discernible, confined and discrete conveyance[s]."

■ The law is clear that a plaintiff seeking to establish a point source discharge, even in the context of airborne pollution, must prove more than that the pollutant originated from an identifiable source. Regardless of from where the pollution originates, a plaintiff must prove that "the pollut[ant] reache[d] the water through a confined, discrete conveyance."[213] With respect to the land-based activities at the Seward Facility, the coal carried to the Bay by the wind as airborne dust cannot constitute a point source discharge. As touched on in *Cordiano*, wind

202. 575 F.3d at 224. The Second Circuit explained that "[s]uch a construction would eviscerate the point source requirement and undo Congress's choice," and that "[t]he CWA's broad remedial purpose, *i.e.*, to 'restore and maintain the chemical, physical and biological integrity of the Nation's waters,' cannot override the plain text and structure of the statute." *Id.*

203. *Id.* at 224–25.

204. *Id.*

205. *Id.* (emphasis added).

206. *Id.*

207. 309 F.3d 1181 (9th Cir.2002).

208. 600 F.3d 180 (2d Cir.2010).

209. No. 00–CIV–5395 (GBD), 2005 WL 1354041 (S.D.N.Y. June 8, 2005) (unpublished).

210. *See* Dkt. 127 at 51.

211. *See League of Wilderness Defenders*, 309 F.3d at 1185–86; *Peconic Baykeeper*, 600 F.3d at 188–89; *No Spray Coalition*, 2005 WL 1354041, at *5, *8.

212. 2005 WL 1354041, at *4.

213. *Trustees for Alaska*, 749 F.2d at 558 (citing *Earth Sciences*, 599 F.2d at 373).

is the polar opposite of a "discernible, confined and discrete conveyance."[214] Consequently, Plaintiffs' second claim fails as a matter of law and Defendants are entitled to summary judgment on that claim. For the same reason, Plaintiffs' motion for summary judgment is denied.

### 3. Snow–Related Discharges.

■ Plaintiffs' final claim is that Defendants plow or otherwise discharge coal-contaminated snow into Resurrection Bay and into a nearby pond and wetlands. Specifically, Plaintiffs allege: (1) that Defendants unintentionally discharge coal-contaminated snow into the Bay when it falls from the edges or through the slats of the loading dock; (2) that Defendants intentionally plow coal-contaminated snow into the Bay and onto a nearby beach; and (3) that Defendants plow contaminated snow into a pond and wetlands north of the Facility.[215] Defendants argue, among other things, that Plaintiffs' evidence does not support their snow-related allegations.[216]

#### a. The Snow that Falls through or from the Dock.

The Court agrees that Plaintiffs have not presented evidence sufficient to establish a CWA violation resulting from coal-contaminated snow falling from or through the loading dock. As an initial matter, the Court notes that the only coal alleged by Plaintiffs to have fallen from the dock is the coal that falls from the conveyer and ship loader, or coal that reaches the dock via atmospheric deposition.[217] This Court,

supra, concluded that these are discharges from which Defendants are either protected from liability by the CWA's permit shield provision, or which are not regulated by the CWA. That being said, this claim separately fails because Plaintiffs do not support it with actual evidence.

The only evidence Plaintiffs point to is that: (1) coal sometimes falls onto the dock during ship loading operations and as the result of atmospheric deposition; and (2) the Facility's manager has, at some point, seen snow fall through the slats of the dock.[218] Based on this evidence, Plaintiffs assume that coal-contaminated snow falls from the dock into the Bay. Plaintiffs do not claim to have seen these discharges and provide no dates, approximate or otherwise, on which coal-contaminated snow actually entered the Bay in this manner. As the Court explained its January 2011 Order, civil penalties assessed against Defendants for unpermitted discharges must be based on actual discharges that are proven to have occurred on specific days.[219]

Furthermore, whether snow on the dock is contaminated by coal at any given time depends on a number of factors. The coal Plaintiffs claim falls from the dock into the Bay is coal that spills from the conveyer and ship loader.[220] The loading dock is approximately ten feet from, and runs alongside, the covered conveyer.[221] Coal that spills from the ship loader and conveyer generally lands only on the very end of the dock.[222] When coal does spill onto the dock, the Facility cleans it up and returns it to the coal stockpiles.[223] Be-

---

**214.** See Cordiano, 575 F.3d at 224.

**215.** Dkt. 120 at 51–52; Dkt. 127 at 58–59.

**216.** See Dkt. 128 at 35–41.

**217.** See Dkt. 120 at 52.

**218.** Id.

**219.** See Dkt. 56 at 27 (January 10, 2011 Order on Defendants' motion for judgment on the pleadings).

**220.** See Dkt. 120 at 52.

**221.** Dkt. 114 at 5.

**222.** Dkt. 114 at 5.

**223.** Id.

cause of the improvements required by the 2009 Prevention Plan, coal no longer spills onto the dock every time a ship is loaded and sometimes no clean up is necessary.[224] Because fewer than twenty ships are loaded per year, as much as a month can go by with no loading activity.[225] The parties agree that snow that accumulates on the dock is regularly removed.[226] Under these circumstances, whether the snow falling from or through the dock is actually contaminated by coal depends largely on the Facility's activities between the time it snows and the time the snow is removed or falls into the Bay. Plaintiffs' bare assumptions are insufficient to establish an actual CWA violation.

Because this claim is not supported by evidence from which a reasonable fact finder could find for Plaintiffs, Defendants are entitled to summary judgment on this portion of Plaintiffs' third claim. Plaintiffs' summary judgment motion on this issue is denied.

b. *The Snow Plowed Directly into the Bay or onto the Beach.*

■ Plaintiffs next claim that Defendants intentionally plow coal-contaminated snow directly from the dock into Resurrection Bay and that Defendants plow coal-contaminated snow from the Facility directly onto the beach, which is then swept into the Bay.[227] The Court finds that material issues of fact prevent these claims from being resolved on summary judgment.

Defendants deny that snow is plowed off of the dock or onto the beach and point to policies prohibiting the intentional discharge of snow or coal into the Bay.[228] Plaintiffs, on the other hand, rely on the statements of Maddox, with no corroborating photographic or other evidence, to support the allegations.[229]

Maddox reports that, in winter 2012, he saw Defendants scoop up coal-contaminated snow and dump it on the shoreline of the beach.[230] Maddox also states that "every time it snows and [the snow] accumulates enough to be removed, [Defendants] plow [snow] off the dock into the water."[231] At his January 31, 2012 deposition, Maddox stated that the last time he saw snow plowed from the dock was November 2011.[232] But, in his declaration in support of Plaintiffs' summary judgment motion, Maddox states that he saw Defendants plow snow over the edge of the dock in *"January,* February, and March of 2012."[233] Maddox has taken hundreds of photos of the facility, many of which are attached to Plaintiffs' summary judgment motion.[234] He has also complained, many hundreds of times, to DEC and to EPA regarding discharges of coal at the Seward Facility.[235] However, Plaintiffs do not present any photographs of Defendants dumping coal off of the dock or onto the beach, or any evidence that Maddox reported these incidents to DEC or EPA.[236]

---

224. Dkt. 114 at 4; Dkt. 125–1 at 18.

225. *See* Dkt. 120–5; Dkt. 120–13; Dkt. 120–15 at 7.

226. Dkt. 114 at 4; Dkt. 121–14 at 13.

227. Dkt. 127 at 58; *see also* Dkt. 106.

228. *See* Dkt. 128 at 40–41; Dkt. 129; Dkt. 130.

229. *See* Dkt. 127 at 58–59; Dkt. 120 at 51.

230. Dkt. 106 at 11.

231. Dkt. 121–14 at 13.

232. *Id.* at 13–14.

233. Dkt. 106 at 11.

234. *See generally* Dkt. 106 (and attached photographs).

235. Dkt. 121–14 at 17–20.

236. Maddox provides photos from 2010 of a pile of what appears to be coal-covered snow near the beach, just outside of the Seward

 

In short, Maddox asserts that Defendants dump snow from the dock and onto the beach, and Defendants assert that this never happens.

Because material issues of fact exist as to whether Defendants plow snow either directly off of the dock into the Bay or onto a beach near the Facility, these claims cannot be resolved on summary judgment and both parties' motions with respect to this portion of Plaintiffs' third claim are DENIED.

### c. The Snow Plowed into the Pond and Wetlands.

Plaintiffs' final snow-related claim is that Defendants plow coal-contaminated snow into a pond and wetlands north of the Facility.[237] The only evidence Plaintiffs provide in support of this claim is several of Maddox's photographs, taken in February 2010 and April 2010, which depict piles of dirty snow in an area north of, and outside of, the Facility's boundaries.[238] Although Maddox asserts in his declaration that the "photos show that snow with coal is plowed directly into a pond and wetland north of the facility," he does not claim to have witnessed the snow being dumped there.[239] In short, Plaintiffs have presented no evidence of when the snow piles were created or who put them there. Because Plaintiffs have presented insufficient evidence to support this claim, Defendants are entitled to summary judgment on this portion of Plaintiffs' third claim, and Plaintiffs' motion for summary judgment on this issue is denied.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' summary judgment motion (Docket No.

---

104) is DENIED. Defendants' summary judgment motion (Docket No. 112) is GRANTED with respect to Plaintiffs' first and second claims, and GRANTED, in part, and DENIED, in part, with respect to Plaintiffs' third claim. The parties' motions to strike (Docket Nos. 132 and 137) are DENIED.

---

Facility. *See* Dkt. 106 at 9; Dkt. 106–37. However, he does not claim to have seen how the snow arrived at that location or when it was put there. The first time he claims to have actually seen Defendants plow snow onto the beach was 2012. *See* Dkt. 106.

