RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0014p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

─────────────────

SIERRA CLUB,

                 *Plaintiff-Appellant,*

    *v.*

ICG HAZARD, LLC,

                 *Defendant-Appellee.*

No. 13-5086

Appeal from the United States District Court
for the Eastern District of Kentucky at London.
No. 6:11-cv-00148—Gregory F. Van Tatenhove, District Judge.

Argued:  October 8, 2013

Decided and Filed:  January 27, 2015

Before:  MERRITT, GIBBONS, and McKEAGUE, Circuit Judges.

─────────────────

**COUNSEL**

**ARGUED:**  Benjamin A. Luckett, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, for Appellant.  Robert G. McLusky, JACKSON KELLY, PLLC, Charleston, West Virginia, for Appellee.  **ON BRIEF:**  Benjamin A. Luckett, Joseph M. Lovett APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, Stephen A. Sanders, APPALACHIAN CITIZENS LAW CENTER, Whitesburg, Kentucky, for Appellant.  Robert G. McLusky, JACKSON KELLY, PLLC, Charleston, West Virginia, Kevin M. McGuire, Laura P. Hoffman, JACKSON KELLY, PLLC, Lexington, Kentucky, for Appellee.  Karma B. Brown, HUNTON & WILLIAMS LLP, Washington, D.C., for Amicus Curiae.

     GIBBONS, J., delivered the opinion of the court in which McKEAGUE, J., joined. MERRITT, J. (pp. 16–18), delivered a separate dissenting opinion.

_____

**OPINION**

_____

JULIA SMITH GIBBONS, Circuit Judge.  This case, a citizen enforcement action under the Clean Water Act, requires consideration of the scope of the Act's "permit shield" in the context of a general discharge permit.  ICG Hazard, LLC, operating under a general permit, conducted surface coal mining in Kentucky.  The company discharged selenium, a pollutant, into surrounding water.  Although the permit did not specify effluent limitations for selenium, the discharge resulted in levels exceeding the threshold in the state's water quality standard.  The district court, finding that the permit shield protected ICG from liability, granted summary judgment in ICG's favor.  Through our analysis of the permit shield's application in the context of a general permit, we also conclude that the permit shield covers ICG's discharges in this case. We therefore affirm.

I.

ICG Hazard operates the Thunder Ridge surface coal mine in Leslie County, Kentucky. During the relevant time period, ICG's running of Thunder Ridge was governed by a five-year Coal General Permit issued by the Kentucky Division of Water ("KDOW") pursuant to the National Pollutant Discharge Elimination System ("NPDES") under the authority of the U.S. Environmental Protection Agency.  The general permit allowed ICG and certain other coal mining operations to discharge certain listed pollutants into the state's water, within the conditions set out in the permit.  The conditions included effluent limitations for several specific pollutants, but not for selenium, a naturally occurring element that endangers aquatic life once it reaches a certain concentration.  But KDOW was aware of the potential for selenium discharges from the mines in the area.  The general permit included a provision recognizing that possibility. KDOW used "one-time" monitoring—a single sampling during the five-year life of the permit— to determine whether selenium levels in surrounding bodies of water were within acceptable levels.

In August 2009, seeking to expand the reach of its surface coal mining at Thunder Ridge, ICG applied to KDOW to modify its coverage under the general permit. The renewal process required ICG to submit water samples from an existing discharge point. The samples showed that the selenium in the surrounding water exceeded the "acute" limit in Kentucky's water quality standards. Those standards set the acute limit at twenty micrograms per liter.

In December 2010, Sierra Club notified ICG of its intent to bring a citizen suit based on the selenium levels. Sierra Club also supported a private citizen's request for further testing. These further tests took place at six locations around Thunder Ridge. None of the tests revealed selenium levels above the acute limit. However, at two of the six sites, the levels exceeded the "chronic" limit of five micrograms per liter. Consequently, the Kentucky Department of Natural Resources ("KDNR") took a "preventive enforcement action," requiring ICG to test for selenium in the second quarter of 2011 and submit the results to KDNR. The U.S. Office of Surface Mining deemed KDNR's response appropriate and notified Sierra Club that it would therefore take no further action.

Sierra Club brought this action in the Eastern District of Kentucky, alleging that ICG's discharges of selenium violated the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1251 *et seq.*, and the Surface Mining Control and Reclamation Act ("Surface Mining Act"), 30 U.S.C. § 1201 *et seq.*, and seeking declaratory judgment, injunctive relief, and civil penalties. The district court awarded summary judgment in ICG's favor on all claims. *Sierra Club v. ICG Hazard, LLC*, Civ. No. 11-148, 2012 WL 4601012 (E.D. Ky. Sept. 28, 2012). It determined that the Clean Water Act's permit shield protected ICG from liability under the Clean Water Act. *Id.* The court held that, because the general permit did not set limits for selenium discharges, ICG could lawfully discharge provided it made proper disclosures. *Id.* at *6–9. As a result, ICG was also protected from liability for violation of Kentucky water quality standards under the Surface Mining Act; otherwise, the district court reasoned, the water quality standards would "supersede" the permit shield. *Id.* at *14.

On appeal, Sierra Club argues that the district court erred in finding that the permit shield applies. In Sierra Club's view, the permit shield does not apply because the discharge of selenium was neither expressly authorized by the general permit nor reasonably contemplated by

KDOW when it issued the permit.  Sierra Club further contends that the Surface Mining Act and the CWA are complementary regulatory schemes, and so holding ICG liable under the Surface Mining Act would not conflict with the CWA.

## II.

We review a district court's grant of summary judgment *de novo*.  *Keith v. Cnty. of Oakland,* 703 F.3d 918, 923 (6th Cir. 2013).  Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c).  The initial burden of showing the absence of a genuine issue of material fact is on the moving party.  *Bridgeport Music Grp., Inc. v. VM Music Corp.*, 508 F.3d 394, 397 (6th Cir. 2007) (citing *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)).  We construe all reasonable inferences in favor of the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To support a genuine dispute, the non-moving party cannot rely on "the mere existence of a scintilla of evidence," and "must do more than simply show that there is some metaphysical doubt as to the material facts."  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 389 (6th Cir. 2008) (internal quotation marks omitted).

## III.

The Clean Water Act "'is a comprehensive water quality statute designed to restore and maintain the chemical, physical, and biological integrity of the Nation's waters.'"  *Ky. Waterways Alliance v. Johnson*, 540 F.3d 466, 469–70 (6th Cir. 2008) (quoting *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 704 (1994)).  The CWA seeks to achieve these goals through two principal mechanisms.  First, it limits the discharge of pollutants through "a default regime of strict liability."  *Piney Run Preservation Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 268–69 (4th Cir. 2001).  The focal point of the regime is section 301 of the CWA, which provides that "the discharge of any pollutant by any person shall be unlawful," unless it falls within certain narrowly prescribed exceptions.  33 U.S.C. § 1311(a).  The main exception to this blanket prohibition is the NPDES, contained in section 402 of the CWA, which provides for the issuance of permits allowing the discharge of pollutants within prescribed limits.  33 U.S.C. § 1342.  *See Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1374 (D.C. Cir. 1977) ("[T]he legislative history makes clear that Congress intended the

NPDES permit to be the only means by which a discharger from a point source may escape the total prohibition of [§] 301(a).").  Second, section 303 of the CWA "requires each State, subject to federal approval, to institute comprehensive water quality standards, establishing water quality goals for all intrastate waters." *PUD No. 1 of Jefferson Cnty.*, 511 U.S. at 704 (citing 33 U.S.C. §§ 1311, 1314).  These standards "provide a supplementary basis . . . so that numerous point sources, despite individual compliance with effluent limitations, may be further regulated to prevent water quality from falling below acceptable levels." *Ky. Waterways Alliance*, 540 F.3d at 470–71 (quoting *PUD No. 1 of Jefferson Cnty.*, 511 U.S. at 703).

Our focus here is on the CWA's first mechanism: the NPDES's permitting scheme. Under the NPDES, the permitting authority may issue a fixed-term permit allowing a point-source discharger to discharge specific pollutants—set out in the permit—subject to limitations on "the quantities, rates, and concentrations" of the specific pollutants being discharged. *Arkansas v. Oklahoma*, 503 U.S. 91, 101 (1992); *see* 33 U.S.C. § 1342.  A state may establish its own permitting authority which, once authorized by the EPA, is then responsible for issuing discharge permits within the state.  *Id.* § 1342(b).  Kentucky has authority to issue permits for waters within the Commonwealth, *see* Approval of Kentucky's NPDES Program, 48 Fed. Reg. 45, 597 (Oct. 6, 1983), and does so through its Division of Water.

A permitting authority may issue individual permits, 40 C.F.R. § 122.21, and general permits, 40 C.F.R. § 122.28.  While an individual permit applies to one specific discharger, a general permit covers an entire category of dischargers within a geographic area.  It may be issued where, within that area, the "categories or subcategories of discharges . . . or disposal facilities all":

> (A) Involve the same or substantially similar types of operations;
>
> (B) Discharge the same types of wastes or engage in the same types of sludge use or disposal practices;
>
> (C) Require the same effluent limitations, operating conditions, or standards for sewage sludge use or disposal;
>
> (D) Require the same or similar monitoring; and
>
> (E) In the opinion of the Director, are more appropriately controlled under a general permit than under individual permit.

40 C.F.R. § 122.28(a)(2)(ii)(A)–(E).  If these criteria are satisfied, the permitting authority—on its own initiative or in response to an application—then "develops a draft general permit incorporating the necessary terms and conditions."  Office of Water Enforcement and Permits, U.S. Envtl. Prot. Agency, General Permit Program Guidance 1, 20 (1988) [hereinafter "General Permit Guidance"].  Once the permit is in place, individual operators may "file a Notice of Intent . . . stating that they plan to operate under the general permit, and absent a negative ruling by the agency, discharges that comply with the terms of the general permit are automatically authorized." *Tx. Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 968 (7th Cir. 2005).  This generally allows dischargers to avoid the "sampling and analysis associated with individual permit applications," General Permit Guidance at 3, and—in the EPA's view—carries several advantages for permitting authorities. *Id.* at 33–35.

If an individual prospective discharger is unable to operate under a general permit, it must apply instead for an individual permit.  The application process for an individual permit takes place as follows:

> The applicant discloses the nature of its effluent discharges to the permitting authority.  The permitting authority analyzes the environmental risk posed by the discharge, and places limits on those pollutants that . . . it "reasonably anticipates" could damages the environmental integrity of the affected waterway.

*Piney Run*, 268 F.3d at 268–69 (quoting *In re Ketchikan Pulp Co.*, 7 E.A.D. 605, 1998 WL 284694 (E.P.A. May 15, 1998)); *see also Atl. States Legal Found., Inc. v. Eastman Kodak Co.*, 12 F.3d 353, 358 (2d Cir. 1993).  A permit holder violates the Act by exceeding the discharge limits that the permit explicitly provides.  But the statute's "permit shield"—stemming from section 1342(k) of the CWA—insulates permit holders from liability for certain discharges of pollutants that the permit does not explicitly mention.  The purpose of the shield is "to insulate permit holders from changes in various regulations during the period of a permit and to relieve them of having to litigate in an enforcement action the question whether their permits are sufficiently strict." *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977).

In *Piney Run*, the Fourth Circuit considered the scope of the permit shield in the context of an individual permit.  Applying *Chevron* deference, the court found the language of section 1342 ambiguous. *Piney Run*, 268 F.3d at 266–68.  The court therefore deferred to the EPA's

reasonable interpretation of the shield, under which a permit holder is exempted from liability for the discharge of pollutants not expressly mentioned in the permit, provided the discharges meet two prongs.  First, the permit holder must comply with the CWA's reporting and disclosure requirements.  *Piney Run*, 268 F.3d at 268 (citing *Ketchikan*, 1998 WL 284694 at *11).  Second, most importantly for the present case, the discharges must be within the permitting authority's "reasonable contemplation."  *Id.* (citing *Ketchikan*, 1998 WL 284694 at *11).  The Fourth Circuit explained:

> Because the permitting scheme is dependent on the permitting authority being able to judge whether the discharge of a particular pollutant constitutes a significant threat to the environment, discharges not within the reasonable contemplation of the permitting authority during the permit application process, whether spills or otherwise, do not come within the protection of the permit shield.

*Id.* at 268.

The *Piney Run* court did not consider—and no other circuit has yet had the opportunity to consider—the applicability and scope of the permit shield when the discharger's operations are governed by a *general* permit.  Given that a general permit covered ICG's operations at Thunder Ridge, we must consider those issues in this case.

IV.

Sierra Club first urges us to hold, effectively, that pollutants may only be discharged if they are explicitly listed in the general permit, thus severely limiting the impact of the permit shield.  In support, Sierra Club points to an EPA policy statement stating that "general permits authorize the discharge of all pollutants within the *specified scope* of a particular general permit."  EPA Revised Policy Statement on Scope of Discharge Authorization and Shield Associated with NPDES Permits, at 3 (1995) [hereinafter "EPA Revised Policy Statement"] (emphasis added).  According to Sierra Club, the "specified scope" language makes clear that any pollutants not specified in the permit may not be discharged.

The district court rejected this argument and, for the same reasons, so do we.  As the district court explained, the Second Circuit addressed and rejected this same argument in the individual-permit context in *Atlantic States Legal Foundation v. Eastman Kodak Co.*, 12 F.3d

353, 357 (2d Cir. 1993).  *Atlantic States* is significant because the EPA later adopted the Second Circuit's analysis in a formal adjudication proceeding in *In re Ketchikan Pulp Co.*, 7 E.A.D. 605, 1998 WL 284694 (E.P.A. May 15, 1998).  Reviewing the regulatory framework as a whole, the district court explained, in line with the *Ketchikan* court: "'[I]t is clear that the permit is intended to identify and limit the most harmful pollutants while leaving the control of the vast number of other pollutants to disclosure requirements.'"  *Sierra Club*, 2012 WL 4601012, at *8 (quoting *Atl. States*, 12 F.3d 353 at 357.

Applying *Chevron* deference, we hold that the EPA's interpretation of the statutory scheme—allowing some pollutants to be discharged even though not specifically listed in the general permit—is "a sufficiently rational one to preclude a court from substituting its judgment for that of the EPA."  *See Chem. Mfrs. Ass'n v. Natural Res. Def. Council, Inc.*, 470 U.S. 116, 125 (1985) (quoting *Train v. Natural Res. Def. Council, Inc.*, 421 U.S. 60, 75 (1975)).  We must first ask whether "Congress has directly spoken to the precise question at issue."  *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).  If congressional intent is clear from the statute, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id.* at 843.  If, however, the statute is ambiguous, we defer to the agency's interpretation, provided that interpretation was promulgated via notice-and-comment rulemaking or a formal adjudication, *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000), and provided it is reasonable, *Chevron*, 467 U.S. at 843.

The statute's permit-shield language is ambiguous because, while it states the exception to the other provisions of the CWA that "compliance with a permit issued pursuant to this section shall be deemed compliance" with the statutory scheme, 33 U.S.C.§ 1342(k), it does not make the scope of that exception clear, *see Piney Run*, 268 F.3d at 267; *Atl. States*, 12 F.3d at 357–58.  Turning to the second step of *Chevron*, we find the EPA's interpretation in *Ketchikan* reasonable.  The EPA explained the practical impossibility of identifying and limiting every potential compound or chemical in a given discharge.  *Id.* (citing *Atl. States*, 12 F.3d at 257).  Consequently, compliance would be impossible and the potential for litigation limitless.  *Ketchikan*, 1998 WL 284964, at *9–10.  This bolsters the EPA's interpretation of what Congress

intended in the statute, at least enough to make that interpretation reasonable under *Chevron*. Thus, we defer to its conclusion.

Like the district court, we are not persuaded by Sierra Club's argument that this analysis should be confined to the individual-permit context and that the EPA's "specified scope" language limits the permissible discharges to pollutants listed in the permit. The EPA's interpretation is contained in its adjudication in *Ketchikan*, on which the *Piney Run* court heavily relied in formulating its two-pronged test. *See Piney Run*, 268 F.3d at 267–69. *Ketchikan* considered and synthesized the pre-existing policy statements, along with many other EPA adjudications and memoranda. *See Ketchikan*, 1998 WL 284694, at *10, 12 & n.34. And although the decision involved an individual permit, the EPA's language is not restricted to that context. On the contrary, it suggests that it relates to the permit shied as it applies to all permits, including general ones. The decision broadly refers to "NPDES permits," the "overall NPDES regulatory scheme," and the "NPDES permitting scheme." *Id.* at *11. It also provides the following policy support for the its rule:

> Although in theory the Agency could structure permits to prohibit the discharge of all pollutants except those listed in the permit, such an approach would require the Agency to include in the permit a list of every pollutant or combination of pollutants that conceivably might be contained in the applicant's wastestreams, and to determine which of those pollutants the Agency considered appropriate for discharge. Since any given wastestream may contain hundreds of pollutants, such a permit-writing approach would be unduly burdensome and costly, and ultimately, impractical. As the Agency has acknowledged: "it is impossible to identify and rationally limit every chemical or compound present in a discharge of pollutants." Consequently, the Agency has determined that the goals of the CWA may be more effectively achieved by focusing on the chief pollutants and wastestreams established in effluent guidelines and disclosed by permittees in their permit applications, rather than by attempting to identify the hundreds or thousands of pollutants potentially present in permittees' wastestreams.

*Id.* at *9.

This reasoning applies with even more force when dealing with general permits. There, absent the permit shield, the permitting authority would not only need to identify the many pollutants that a single polluter could discharge, but all of the pollutants and combinations of pollutants that could be discharged by all polluters that may later fall under the general permit. It

would be anomalous for the EPA to impose a different standard for general permits.  This is particularly so given the EPA's statement that "[a] general permit is identical to an individual permit regarding effluent limitation, water quality standards, monitoring and sampling requirements, and enforceability."  General Permit Guidance, at 3–4.

Overall, the EPA's position, again entitled to deference as a reasonable interpretation of an ambiguous statute, suggests no desire on the part of the EPA to eliminate the permit shield in the context of a general permit.  We therefore reject Sierra Club's contention that liability should exist for the discharge of any chemical or compound not specifically itemized in the permit.

V.

Having decided that the permit shield applies here, we must next consider the scope of the permit shield that applies to a general permit.  Here, the first prong of the *Piney Run* test— whether the polluter complied with its reporting requirements—is clearly satisfied because ICG disclosed the selenium discharge when it requested modification of its permit.  Sierra Club argues that this was not enough.  In its view, ICG's failure to disclose the discharge at the beginning of the application process negates the protection of the permit shield.  It compares this case to the earlier and more specific disclosures that were provided in *Alaska Community Action on Toxics v. Aurora Energy Services, LLC*, 940 F. Supp. 2d 1005 (D. Alaska 2013), *rev'd*, 765 F.3d 1169 (9th Cir. 2014).  But the *Alaska Community Action* disclosures are beside the point.  Under the first prong of the *Piney Run* test, the key is that the polluter complied with the disclosure requirements under the relevant permit.  Those requirements of the permit in *Aurora Energy* were much stricter than they were in the present case.  *See Aurora Energy*, 940 F. Supp. 2d at 1019–20.  ICG complied by providing a one-time sample at some time during the life of the permit; it did not have to disclose at the time it applied.  This satisfies the first prong under *Piney Run*.

This conclusion does not necessarily decide the issue, however.  We must decide whether the second prong also applies in the context of a general permit and, if so, whether ICG's actions were within the ambit of KDOW's "reasonable contemplation."

In our view, the second prong does indeed apply in the context of a general permit, and polluters must therefore show that the discharge was within the reasonable contemplation of the permitting authority. We again defer under *Chevron* to the EPA's reasonable interpretation of an ambiguous piece of legislation. As stated, that legislation provides simply that "compliance with a permit issued pursuant to this section shall be deemed compliance" with the statutory scheme. 33 U.S.C. § 1342(k). But it is ambiguous as to the precise mechanism and scope of the permit shield, which requires us to defer to a reasonable agency interpretation. *See Chevron*, 467 U.S. at 843.

As discussed, the EPA spoke in broad terms in *Ketchikan* about the permit shield, not limiting its analysis to individual permits but referring to the "overall NPDES regulatory scheme." 1998 WL 284964, at \*11. The EPA has also stated that the "[a] general permit is identical to an individual permit regarding effluent limitation, water quality standards, monitoring and sampling requirements, and enforceability." General Permit Guidance, at 3–4.

The EPA reasonably interprets the statute as imposing the same requirements on polluters under general permits as under individual permits. Specifically, it is reasonable for the EPA to require, even in the general-permit setting, that the discharges be within the agency's reasonable contemplation. The EPA's rationale for the scope of the permit shield is to more effectively administer the CWA by avoiding an unduly burdensome permit-writing scheme. *See Ketchikan*, 1998 WL 284964, at \*9. In other words, it can police statutory compliance more effectively by not imposing liability for discharges that would be within the permitting authority's reasonable contemplation in any event but would overburden the authority to specifically include in the permit. If the discharge is within the authority's reasonable contemplation, it can determine in advance the steps necessary to protect the water quality, such as including an effluent limit for the specific pollutant. *See Piney Run*, 268 F.3d at 268 ("Because the permitting scheme is dependent on the permitting authority being able to judge whether the discharge of a particular pollutant constitutes a significant threat to the environment, discharges not within the reasonable contemplation of the permitting authority . . . do not come within the protection of the permit shield.").

By contrast, it would not help to administer the CWA's scheme more effectively if polluters, whether covered by an individual permit or a general permit, could escape liability for extraordinary discharges not within the authority's reasonable contemplation. The permit shield would be counterproductive, for example, if it would allow the discharge of arsenic—far beyond an authority's reasonable contemplation—to take place without consequences. This concern is equally present in the general-permit context, which likely explains the EPA's insistence that the general and individual permits be identical in their enforceability. Thus, the EPA's reasonable interpretation of the permit shield in *Ketchikan* does not evince any intention to abandon the second prong of the *Piney Run* test in the general-permit context.

The *Piney Run* court held that the individual permit holder was shielded from liability because the discharge of the pollutant was within the permitting authority's reasonable contemplation at the time of the application for the permit. *Id.* at 268. In the general permit context, of course, an authority cannot reasonably contemplate each specific facility's discharges when it first issues the general permit because the agency cannot know which specific facilities will seek coverage under the general permit. But the authority can contemplate the pollutants that may be discharged generally from polluters that may later be covered by the general permit. The authority can then set the effluent limitations necessary in order to protect the water quality.

This complements one of the principal purposes of the CWA and its permit shield, which is to allocate responsibility for discharges on the party that had the burden of gathering or disclosing information. As the district court correctly explained, "[t]he only significant difference [between an individual permit and a general permit] is that 'a larger share of the responsibility for the information gathering process leading up to the development of a general permit falls on the permitting authority rather than on the permit applicants.'" *Sierra Club*, 2012 WL 4601012, at *7 (quoting General Permit Guidance at 33–34). As a result:

> by virtue of being deemed eligible for a general permit, the permitting agency has held that it can properly regulate a class of dischargers without detailed information about individual [discharges], but the permitting agency also has flexibility to institute specific control mechanisms as necessary. Therefore, if a general permit is insufficient in some respect, the complaint should be directed at the permitting authority.

*Id.* (internal quotation marks omitted).  It follows that an individual polluter should not be liable when it meets the disclosure requirements for a particular pollutant and the discharge of the pollutant at issue was within the authority's reasonable contemplation at the time the general permit was issued.

ICG's discharge of selenium was within KDOW's reasonable contemplation because KDOW knew at the time it issued the general permit that the mines in the area could produce selenium.  Indeed, a provision of the permit recognized the possibility that any of the mines under its purview may discharge selenium.  KDOW considered the possibility and included a one-time monitoring requirement as a condition of coverage under the general permit.  In addition, KDOW's handling of post-issuance evidence of selenium discharges—requiring continued monitoring pursuant to a preventive enforcement action—demonstrates, by negative implication, that selenium discharges were within KDOW's reasonable contemplation, as it declined to otherwise impose additional selenium limits or conditions on ICG's Thunder Ridge operations.  The permit shield therefore covers ICG's discharge of selenium.  We affirm the district court's decision on this claim.

VI.

Sierra Club's third, fourth and fifth claims allege that ICG's selenium discharges also resulted in violations of its surface mining permit issued by KDNR pursuant to authority granted by the federal Office of Surface Mining under the Surface Mining Act.  When the parties stipulated that these claims are premised on the same point source discharges that form the basis for Sierra Club's first and second claims for relief under the CWA, the district court awarded summary judgment to ICG on the third, fourth and fifth claims as well.  The court concluded that enforcement of water quality standards promulgated pursuant to the Surface Mining Act would contravene § 702(a)(3) of the Surface Mining Act by effectively "superseding" the permit shield protection ICG is entitled to under the CWA.

The district court acknowledged that effluent limitations enforced under the CWA and water quality standards enforced under the CWA and Surface Mining Act are distinct concepts. The court also recognized, however, that the state water quality standards incorporated into ICG's surface mining permit—and said by Sierra Club to have been violated as a result of ICG's

selenium discharges—are essentially the same standards that Sierra Club asserted in support of its claims that the same selenium discharges violated effluent limitations under the CWA.  Yet, because of the permit shield, ICG was deemed to be in compliance with the CWA and therefore not subject to enforcement action, by governmental agency or citizen suit.  To hold ICG liable under the Surface Ming Act for violating the same standards, the court concluded, would contravene § 702(a)(3) of the Surface Mining Act, which provides in relevant part that "[n]othing in this Act shall be construed as 'superseding, amending, modifying, or repealing' the CWA or rules or regulations promulgated thereunder.  30 U.S.C. § 1292(a).  In so ruling, the court relied heavily on In re Surface Mining Regulation Litigation, 627 F.2d 1346, 1366–68 (D.C. Cir. 1980).  See Sierra Club, 2012 WL 4601012 at *12–14.

We agree.  The D.C. Circuit's decision in Surface Mining Regulation, here argued in support of each side's position, is both instructive and illustrative.  In Surface Mining Regulation, the court recognized that Congress intended regulation under the CWA and regulation under the Surface Ming Act to be complementary.  Where regulation under the CWA is silent, regulation under the Surface Mining Act is permissible, but where there is regulatory overlap, § 702(a)(3) of the Surface Mining Act expressly directs that the CWA and its regulatory framework control, so as to afford consistent standards nationwide.  Surface Mining Regulation, 627 F.2d at 1367.  The court defined this "silence" in the CWA regulatory scheme as an "absence of regulation" or a "regulatory gap."  Id.

Sierra Club argues that this is precisely the situation we have here.  Because operation of the permit shield bars enforcement of Kentucky's water quality-based effluent limitations under the CWA, Sierra Club contends there is a regulatory gap that may and should be filled by enforcement of the water quality standards under the Surface Mining Act.  Yet, as the reasoning of Surface Mining Regulation makes clear, enforcement of the permit shield prescribed in CWA § 402(k) is not an "absence of regulation."  Rather, the operation of the statutory permit shield is closely akin to the "variance from effluent limitations" and "exemptions from effluent requirements" under the CWA that were addressed in Surface Mining Regulation.  The court held that such variances and exemptions are actually "substantive elements of regulation" under the CWA, not "regulatory gaps."  Id. at 1369.  To permit regulation under the Surface Mining

Act in a manner inconsistent with the CWA or in conflict with regulatory practice under the CWA, the court held, would contravene the mandate of § 702(a)(3) of the Surface Mining Act. Id.

As the district court concluded, the operation of the permit shield in this case "mirrors" the operation of the variance and exemptions presented in Surface Mining Regulation. The permit shield is not an absence of regulation but a substantive element of regulation under the CWA that affords consistent treatment to NPDES permit holders nationwide. To hold, in connection with the very same selenium discharges, that ICG is in compliance with Kentucky water quality-based effluent limitations for purposes of the CWA but in violation of those same water quality standards under the Surface Mining Act would create an inconsistency or conflict in regulatory practice, in direct contravention of § 702(a)(3).

Hence, because Sierra Club's claims under the Surface Mining Act are premised on ICG discharges of selenium that are violative of essentially the same water quality standards with which ICG is deemed to be in compliance for purposes of the CWA; and because the CWA regulatory framework controls over inconsistent regulation under the Surface Mining Act, it follows that Sierra Club's claims under the Surface Mining Act are effectively barred by operation of the permit shield under the CWA. Accordingly, on de novo review, we find no error in the district court's award of summary judgment to ICG on Sierra Club's claims under the Surface Mining Act.

## VII.

For the foregoing reasons, we affirm the decision of the district court.

---

**DISSENT**

---

MERRITT, Circuit Judge, dissenting.  The majority allows the silence of local Kentucky environmental regulators to turn the Clean Water Act on its head.  They do this, despite the undisputed fact that illegal toxic discharges of dirty selenium water occurred, because they believe we must assume that Kentucky's "general permit" tacitly authorizes toxic discharges of selenium.  In so doing, they extend to the one-size-fits-all "general" permit a presumption previously applicable only to custom-tailored, "individual permits."  Because I find neither the authority nor the intention to allow these flagrant and unlimited violations of the Clean Water Act in the general permit at issue here, I dissent.

Congress enacted through the Clean Water Act a "national policy that the discharge of toxic pollutants in toxic amounts be prohibited."  33 U.S.C. § 1251(a)(3).  Congress ordered the EPA to include selenium—an element toxic to human and aquatic life—in the early lists of prohibited toxic pollutants.  *See* Publication of Toxic Pollutant List, 43 Fed. Reg. 4108, 4108–09 (Jan. 31, 1978) (codified and updated at 40 C.F.R. § 401.15).  In compliance with the Act, the EPA promulgated and Kentucky adopted water quality standards that established upper limits on selenium concentrations for long-term discharges (5 µg/L for discharges exceeding 96 hours) and short-term discharges (20 µg/L for discharges exceeding one hour).  That is the law, and my colleagues are turning a blind eye to its enforcement.  With this opinion in hand, coal mines in Kentucky are at liberty to violate the Clean Water Act.

Congress allows neither Kentucky nor the EPA to issue permits approving discharges in excess of those regulations.  40 C.F.R. § 122.4.  To the extent that the Act authorizes Kentucky's regulators to issue permits, those permits' "[l]imitations must control all pollutants" that in the agency's assessment "will cause, have the reasonable potential to cause, or contribute to an excursion above any State water quality standard."  40 C.F.R. § 122.44(d)(1).  Everyone agrees that the toxic discharges of selenium from this mine exceed those limits.  *See, e.g.*, ICG Hazard Permit Appl. 6 (showing selenium concentrations of 29.2 µg/L at one of the mine's discharge points).  But the mine and my colleagues believe the mine's compliance with a general permit

silent about selenium should exempt it from liability for its knowing violation of Congress's national policy against polluting the waters.

The "permit shield" invoked here functions primarily to protect permit holders' reliance on valid permits by "shielding" them from liability if regulators promulgate more rigorous standards during the term of a valid permit. *E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977). In the context of an individual permit—a category of contractual permits issued after significant exchanges between a polluter and the issuing agency—the Fourth Circuit has interpreted this shield to protect polluters from liability for discharges tacitly approved by regulators. *See Piney Run Pres. Ass'n v. Cnty. Comm'rs*, 268 F.3d 255, 267–68 (4th Cir. 2001). Under the *Piney Run* approach, when an individual permit applicant discloses its expected discharges to a permitting authority, compliance with the terms of the individual permit may protect that polluter from liability for those disclosed emissions even if the permit does not specifically authorize those emissions. The polluter is thus permitted to rely on the regulators' acquiescence to unproblematic emissions, just as contracting parties may sometimes rely on assurances provided during contract negotiations when interpreting a resulting ambiguous agreement.

The majority opinion suggests that if we decline to extend this interpretation to cover general permits "the permitting authority would not only need to identify the many pollutants that a single polluter could discharge, but all of the pollutants and combinations of pollutants that could be discharged by all polluters that may later fall under the general permit." Maj. Op. at 9. It relies in part on a thirty-five-year-old EPA observation that "it is impossible to identify and rationally limit every chemical or compound present in a discharge of pollutants." *Id.* at 9 (quoting *Ketchikan Pulp Co.*, 7 E.A.D. 605, 618 (EAB 1998)); *see Ketchikan Pulp Co.*, 7 E.A.D. at 618 n.29 (citing 45 Fed. Reg. 33,516, 33,523 (May 19, 1980) (grounding that impossibility in "regulatory gaps" that close when EPA establishes regulations for a particular pollutant)).

This concern was valid when it was expressed at the beginning of the permitting process in the 1970s. *See Ketchikan*, 7 E.A.D at 618 & n.29 (quoting *Atl. States Legal Found., Inc., v. Eastman Kodak Co.*, 12 F.3d 353, 358 (2d Cir. 1993) (quoting an EPA memorandum from Apr. 28, 1976)). It is also likely valid when applied to chemicals not covered by clear EPA

regulations or state equivalents.  *See Atl. States Legal Found*, 12 F.3d at 357–58 (rejecting a hyperbolic interpretation that would require explicit limits on all chemicals, including water). But neither a long-overcome dearth of validated standards nor an administrative prerogative to disregard the insignificant components of a polluter's discharge justifies extending the permit shield to cover the knowing and otherwise-illegal discharge of one of the most clearly regulated toxic pollutants under the Clean Water Act.

The Clean Water Act prohibits the discharge of selenium without a permit.  The EPA and Kentucky codified clear legal limits for those permits.  Deference to a prior administrative choice to focus on the most dangerous chemicals and work with good faith applicants to advance the goals of the Clean Water Act does not require us to turn a blind eye to the knowing discharge of a notorious toxic pollutant.  Kentucky's agency lacked the authority to explicitly authorize a discharge of selenium in violation of the Clean Water Act.  I see no reason to infer an *ultra vires* authorization for that illegal discharge from the state agency's silence in its general permit.  I would allow the plaintiff to proceed under the citizen suit provision of the Clean Water Act.