**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-2194**

SOUTHERN APPALACHIAN MOUNTAIN STEWARDS; APPALACHIAN VOICES; SIERRA CLUB,

Plaintiffs - Appellants,

v.

RED RIVER COAL COMPANY, INCORPORATED,

Defendant - Appellee.

Appeal from the United States District Court for the Western District of Virginia, at Big Stone Gap. James P. Jones, District Judge. (2:17-cv-00028-JPJ-PMS)

Argued: December 8, 2020                    Decided: March 30, 2020

Before GREGORY, Chief Judge, and NIEMEYER and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge Richardson wrote the opinion, in which Chief Judge Gregory and Judge Niemeyer concurred.

**ARGUED:** John Michael Becher, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, for Appellants. Dabney J. Carr, TROUTMAN PEPPER HAMILTON SANDERS LLP, Richmond, Virginia, for Appellee. **ON BRIEF:** Peter Morgan, SIERRA CLUB, Denver, Colorado, for Appellants. Brooks M. Smith, TROUTMAN SANDERS LLP, Richmond, Virginia, for Appellee.

RICHARDSON, Circuit Judge:

Virginia has promulgated water-quality standards by regulation under the federal Surface Mining Control and Reclamation Act ("Surface Mining Act") that are effectively the same as the water-quality standards under the federal Clean Water Act. Under the Clean Water Act, an operator's compliance with its issued permit shields it from liability for certain violations of those standards. The Surface Mining Act does not include its own permit liability shield. This raises the question we must answer: When an operator's conduct is shielded from liability under the Clean Water Act, can the operator still be held liable under the equivalent Surface Mining Act standards?

How we answer this question depends on the Surface Mining Act's saving clause, which bars construing the Act in any way that would supersede, amend, modify, or repeal the Clean Water Act and other laws. *See* 30 U.S.C. § 1292(a)(3). Because here the Surface Mining Act's lack of a permit shield supersedes, amends, or modifies the Clean Water Act's permit shield, we hold that the saving clause prevents liability under the Surface Mining Act for conduct that is otherwise shielded from liability under the Clean Water Act. So we affirm the district court's grant of summary judgment for Red River Coal Company on the Surface Mining Act claim.

## I.    Background

### A.    The regulatory scheme

The Clean Water Act, the colloquial name of the amended Federal Water Pollution Control Act, regulates the issuance of pollutants from "point sources," generally defined as any "discernible, confined and discrete conveyance" such as a pipe, into United States

2

waters. 33 U.S.C. § 1362(14); *see also* § 1251 *et seq.* The core of the Act prohibits "the discharge of any pollutant by any person." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 265 (4th Cir. 2001); *see* § 1311(a). But compliance with a Clean Water Act permit issued under the National Pollutant Discharge Elimination System serves as an exception to this liability. § 1342(k); *Piney Run*, 268 F.3d at 265.[1] Once granted, a permit allows its holder to discharge a limited amount of pollutants. §§ 1311(a), 1342(a), (c). Compliance with that permit "shall be deemed compliance" with the Clean Water Act's standards (namely, the effluent—wastewater—limitations, § 1311, water-quality-related effluent limitations, § 1312, national standards of performance, § 1316, toxic and pretreatment effluent standards, § 1317, and ocean discharge criteria, § 1343). § 1342(k); *see also E.I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 138 n.28 (1977) (such permits provide "finality").[2] This liability shield not only covers discharges listed

---

[1] Given lawyers'—particularly environmental ones—affinity for acronyms, it is no surprise that everyone calls these permits "NPDES permits." *Cf. N. Cheyenne Tribe v. Norton*, 503 F.3d 836, 839 n.1 (9th Cir. 2007). While deviations from acronyms can cause confusion, we do our best to speak in plain English so that those lacking subject-matter expertise might understand. *Cf.* D.C. Circuit Handbook of Practice and Internal Procedures 43 (2020). So we will refer to these "NPDES permits" as Clean Water Act permits, though we bow to expediency in using the widely recognized "EPA" to refer to the Environmental Protection Agency.

[2] Plaintiffs note that the Clean Water Act permit-shield provision does not protect permit holders from non-compliance with water-quality standards promulgated by states. *See* § 1313 (mandating states to set water-quality standards for each body of water within a state). But "water quality standards are not themselves directly enforced by the EPA." *Scott v. City of Hammond*, 741 F.2d 992, 995 (7th Cir. 1984). Those water-quality standards are only enforceable by the EPA if they are affirmatively incorporated within the permit. *See* 33 U.S.C. §§ 1342(k), 1319(a)(3). The same holds for citizen suits, which can only be brought to enforce a state-promulgated water-quality standard under § 1313 if the (Continued)

3

3

on this permit but also other discharges "adequately disclosed to the permitting authority." *Piney Run*, 268 F.3d at 269. Thus, an operator in compliance with its Clean Water Act permit is shielded from liability in EPA and citizen-suit enforcement actions. §§ 1319, 1365.

These permits may be issued by the EPA or the states to which the EPA has delegated its authority. § 1342(c)(1). The EPA delegated its authority to the Commonwealth of Virginia in 1975. 57 Fed. Reg. 43,734 (Sept. 22, 1992); *see also* J.A. 43 (approving a sub-delegation to the Virginia Department of Mines, Minerals and Energy, Division of Mined Land Reclamation).

Five years after passing the Clean Water Act, Congress passed the Surface Mining Act. The Surface Mining Act, among other things, "establish[es] a nationwide program to protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a); *see also Consolidation Coal Co. v. Costle*, 604 F.2d 239, 251 (4th Cir. 1979), *rev'd on other grounds sub nom. E.P.A. v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64 (1980). It does so by allowing states to exclusively regulate surface coal mining operations within their borders if they satisfy certain conditions. § 1253(a). Virginia satisfied these conditions. 46 Fed. Reg. 61,088 (Dec. 15, 1981). With this

---

standard is incorporated within the permit. 33 U.S.C. § 1365(a)(1) (citizen suits may be brought against any person alleged to have violated "an effluent standard or limitation under this chapter"); *id.* § 1365(f)(7) (defining "effluent standard or limitation under this chapter"). And "[i]t is clear . . . that if a permit holder discharges pollutants precisely in accordance with the terms of its permit, the permit will 'shield' its holder from [Clean Water Act] liability." *Piney Run*, 268 F.3d at 266; *see also* § 1342(k). So Plaintiffs' argument on this point does not hold water.

4

regulatory authority, Virginia needed to, and did, create a permit system for surface coal mining and reclamation operations that, at a minimum, incorporated the Surface Mining Act's anti-pollution performance standards. § 1253(a)(4); *see* Va. Code Ann. § 45.1-242(B). Like the Clean Water Act, the Surface Mining Act requires an operator wishing to "engage in or carry out on lands within a State any surface coal mining operations" to "first obtain[] a permit issued by such State." § 1256(a). But, unlike a Clean Water Act permit, compliance with a Surface Mining Act permit does not itself shield its holder from liability under the Surface Mining Act.

## B.    The proceedings below

In August 2017, Plaintiffs Southern Appalachian Mountain Stewards, Appalachian Voices, and the Sierra Club sued Red River Coal Company, Inc. They alleged that Red River had violated the Clean Water Act, the Surface Mining Act, and, in the alternative, the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.* (1976). Plaintiffs' claims stemmed from alleged discharges of pollutants from point sources at Red River's now-inactive North Fox Gap Surface Mine in Virginia. Red River's activities at the mine were governed by a combined Clean Water Act and Surface Mining Act permit issued by Virginia.[3]

---

[3] Virginia first granted Red River a combined Clean Water Act and Surface Mining Act permit in 1992. J.A. 162. This combined permit was renewed in 1997, J.A. 203, 2002, J.A. 209, and 2006, J.A. 225. In 2015, Virginia issued a draft renewal permit, *S. Appalachian Mountain Stewards v. Red River Coal Co., Inc.*, 420 F. Supp. 3d 481, 487–88 (W.D. Va. 2019), but the EPA lodged an objection, J.A. 797. And federal regulations bar a state from issuing a permit over the EPA's objection. 40 C.F.R. § 122.4(c). The EPA never withdrew its objection, but after several months, Virginia renewed the permit (Continued)

Red River moved for summary judgment on all claims. And the district court granted the motion. *S. Appalachian Mountain Stewards*, 420 F. Supp. 3d at 498.

The district court found the Surface Mining Act claim was barred by that Act's saving clause. *S. Appalachian Mountain Stewards*, 420 F. Supp. 3d at 498. That clause limits the effect of the Act: Nothing in the Surface Mining Act "shall be construed as superseding, amending, modifying, or repealing . . . [the Clean Water Act and] the State laws enacted pursuant thereto." 30 U.S.C. § 1292(a)(3).[4] The district court held that where a Clean Water Act permit precludes liability under the Clean Water Act for certain activities, the Surface Mining Act's saving clause bars imposing Surface Mining Act liability for the same actions. *S. Appalachian Mountain Stewards*, 420 F. Supp. 3d at 498 ("[F]inding that Red River complied with the [Clean Water Act] but has violated [the

anyway. J.A. 233. Regardless of the effect of Virginia's 2015 renewal, Red River's 1992 combined permit remains in force. A state-issued permit may continue past its expiration date until the renewed permit's effective date "if State law allows." 40 C.F.R. § 122.6(d)(1). And Virginia state law allows that continuation under conditions that both parties agree Red River has satisfied. *See* 9 VA. ADMIN. CODE § 25-31-70(A). This continued combined permit is "fully effective and enforceable." *Id.* § 25-31-70(B).

[4] 30 U.S.C. § 1292(a)(3) states:

Nothing in this chapter shall be construed as superseding, amending, modifying, or repealing the Mining and Minerals Policy Act of 1970 (30 U.S.C. 21a), the National Environmental Policy Act of 1969 (42 U.S.C. 4321-47), or any of the following Acts or with any rule or regulation promulgated thereunder, including, but not limited to—
. . .
(3) The Federal Water Pollution Control Act (79 Stat. 903), as amended, the State laws enacted pursuant thereto, or other Federal laws relating to preservation of water quality.

Surface Mining Act] based on the same discharges would allow [the Surface Mining Act] to override the [Clean Water Act's] permit shield and would thus violate [the saving clause].").

Plaintiffs timely appealed only the district court's grant of summary judgment to Red River on the Surface Mining Act claim. We have jurisdiction, 28 U.S.C. § 1291, and review the grant of summary judgment de novo, *Calloway v. Lokey*, 948 F.3d 194, 201 (4th Cir. 2020).

## II.    Discussion

Red River's combined permit requires it to comply with both the Clean Water Act's standards and the water-quality standards Virginia promulgated under the Surface Mining Act. *See* J.A. 27 (citing Va. Code Ann. § 45.1-242(B) and 4 Va. Admin. Code § 25-130-773.17(c)). As they apply here, those standards appear to be effectively the same. And there is no dispute on appeal that Red River cannot be held liable for any violations of the Clean Water Act standards because of its compliance with its Clean Water Act permit. But Plaintiffs contend that Red River's activities at the mine have violated the Surface Mining Act's standards and are not covered by the Clean Water Act permit shield.

We first discuss how the Clean Water Act's permit shield interacts with the Surface Mining Act's saving clause before addressing Plaintiffs' counterarguments.

### A.    The Surface Mining Act's saving clause

We agree with the district court—and thus the Sixth Circuit in *Sierra Club v. ICG Hazard, LLC*, 781 F.3d 281, 291–92 (6th Cir. 2015)—that liability may not be imposed under the Surface Mining Act for a specific discharge when the Clean Water Act's permit

7

shield bars liability under the Clean Water Act for that same discharge. *See S. Appalachian Mountain Stewards*, 420 F. Supp. 3d at 498. We conclude that although the Clean Water Act and the Surface Mining Act substantive water-quality standards are "not . . . inconsistent," *id.*, the saving clause does more than prohibit rules or regulations that are "inconsistent" with the Clean Water Act: it prohibits those that more broadly "supersed[e], amend[], modify[], or repeal[]" the Clean Water Act, 30 U.S.C. § 1292(a). And even if the saving clause only prohibited inconsistencies between the two statutory regimes, in this case, there is an inconsistency. Even though the substantive standards may not be inconsistent, the scope of liability for violating those standards is.

The ordinary meaning of the terms in the saving clause makes clear that the clause does more than prevent *inconsistent* rules and regulations. *See In re Surface Mining Regul. Litig.*, 627 F.2d 1346, 1366 (D.C. Cir. 1980) (reading the saving clause to broadly prohibit the "altering in any fashion" of the Clean Water Act). The term "supersede" means "obliterate, set aside, annul, replace, make void, inefficacious or useless, repeal. To set aside, render unnecessary, suspend, or stay." *Supersede*, Black's Law Dictionary (6th ed. 1979). "[Black's Law Dictionary, Merriam Webster's Collegiate Dictionary, and Webster's New Twentieth Century Dictionary of the English Language] indicate that the word 'supersedes' involves replacing one thing with another, rather than causing something to be cancelled or invalidated without replacement." *Bodine v. Cook's Pest Control Inc.*, 830 F.3d 1320, 1326–27 (11th Cir. 2016). Likewise, the word "modify" means "[t]o alter; to change in incidental or subordinate features; enlarge, extend; amend; limit, reduce." *Modify*, Black's Law Dictionary (6th ed. 1979). The term "amend" has a

8

similar definition. *See Amend*, Black's Law Dictionary (6th ed. 1979) ("[t]o change, correct, revise").[5]

Perhaps the Surface Mining Act standards could "replace," "render unnecessary," "limit," "change, correct [or] revise" the Clean Water Act's permit-shield provision without being inconsistent with it. For example, if the Surface Mining Act imposed more stringent requirements than the Clean Water Act's corresponding standards, we would not say that the Surface Mining Act standards conflict with the Clean Water Act's standards, as it would be impossible for an operator to comply with the Surface Mining Act but not the Clean Water Act. But in that situation the Surface Mining Act standards would effectively "replace" or "change" the Clean Water Act standards by setting forth the actual standard of performance operators must meet. So inconsistency is sufficient, but not necessary, for the saving clause to operate. That Virginia's Surface Mining Act substantive standards are consistent with the Clean Water Act does not, by itself, signify that the saving clause does not apply.[6]

---

[5] The term "repeal" requires inconsistency but is only one of four verbs in the statute. *See Repeal*, BLACK'S LAW DICTIONARY (6th ed. 1979) ("abrogation or annulling of a previously existing law by the enactment of a subsequent statute which declares that the former law shall be revoked and abrogated . . . or which contains provisions so contrary to or irreconcilable with those of the earlier law that only one of the two statutes can stand in force" as distinguished from "amendment," which means "alteration in the law already existing").

[6] Plaintiffs contend that 33 U.S.C. §§ 1311(b)(1)(C) and 1370 support their argument. But reliance on those statutes is misplaced. "Section 1311(b)(1)(C) allows the EPA to issue 'any more stringent limitation[s]' if technology-based effluent limitations cannot 'meet water quality standards, treatment standards, or schedules of compliance.'" *Nat. Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 629 (2018). But these more (Continued)

9

But even if the saving clause only applies when there is some inconsistency between statutes, there is one here, even if not in the substantive provisions. In arguing there is not, Plaintiffs focus on the wrong statutory provisions. Although Virginia's Surface Mining Act water-quality standards are not "inconsistent" with the Clean Water Act, *see S. Appalachian Mountain Stewards*, 420 F. Supp. 3d at 498, the relevant "inconsistency" between the statutes is not the substantive water-quality standards but the existence—or lack thereof—of a liability-shielding permit regime. The Clean Water Act provides an exemption from liability for discharges if the discharger has a Clean Water Act permit. That exemption "conflicts" with the Surface Mining Act's failure to provide a liability shield for the same discharges. That the Surface Mining Act does not have a mechanism to protect operators from liability for activities that are otherwise shielded from Clean

---

stringent limitations "established pursuant to any State law or regulations" must have been promulgated "not later than July 1, 1977." § 1311(b)(1)(C); *see Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1312 (9th Cir. 1992) (holding that a total maximum daily load established in 1991 cannot fall under § 1311(b) because the section "reference[d] is in the context of establishing a 'Timetable for achievement of objectives'" and "requires achievement of the described limitations 'not later than July 1, 1977'"). The Virginia state-law standards Plaintiffs reference went into effect after that date. *See* 4 VA. ADMIN. CODE 25-130-816.41, .42 (effective date Dec. 15, 1981). So § 1311 does not apply to them.

Reliance on these statutes is unavailing for another reason. Section 1311 permits more stringent limitations to be enacted by state law or regulations "under authority preserved by section 1370." § 1311(b)(1)(C). And § 1370 provides that "[e]xcept as expressly provided in this chapter, nothing in this chapter shall [] preclude or deny the right of any State . . . to adopt or enforce [] any standard or limitation respecting discharges of pollutants, or [] any requirement respecting control or abatement of pollution," unless the state standards are less stringent than the federal standards. But to the extent that the Surface Mining Act's saving clause "precludes" Virginia's right to "adopt or enforce" its Surface-Mining-Act-promulgated water-quality standards, the saving clause is not "in th[at] chapter" so § 1370's general rule does not apply.

Water Act liability by a permit effectively "supersede[s]," "modif[ies]," or "amend[s]" the permitting regime set forth in the Clean Water Act.

The Supreme Court cases that Plaintiffs cite, *Morton v. Mancari*, 417 U.S. 535 (1974), and *Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995), do not dictate a different conclusion. *Morton* states that "absent a clearly expressed congressional intention to the contrary," statutes capable of co-existing should be read to do so. 417 U.S. at 551. Plaintiffs argue that Red River could comply with both the Surface Mining Act and the Clean Water Act and should be required to do so. But the existence of the saving clause is "a clearly expressed congressional intention" that Red River's permit should protect it from liability when it complies with the provisions of that permit. *Id.* And *Myrick* considers the scope of implied conflict preemption, which implicates federalism concerns not present in a case addressing the interaction between two federal regulatory schemes. 514 U.S. at 287–90.

Plaintiffs cite several statements from the federal Office of Surface Mining Reclamation and Enforcement that it claims anticipate enforcement of the Surface Mining Act's performance standards independent of the Clean Water Act's regulatory regime. But those cited statements do not contemplate the issue we face: the effect of the Surface Mining Act's saving clause on operators' actions that violate the same substantive standards promulgated under both the Clean Water Act and the Surface Mining Act, where those actions are allowed by virtue of their Clean Water Act permit.

11

One statement, however, is worth considering in greater detail. In 1979, the Office of Surface Mining promulgated rules to implement the federal Surface Mining Act program and addressed its understanding of the saving clause:

> Congress intended that compliance with the [Surface Mining Act] would not relieve an operator from compliance with other environmental statutes. Congress did not intend that compliance with other environmental statutes should relieve operators from compliance with the Surface Mining Act.
>
> The language of Section 702(a) of the [Surface Mining Act], which provides that nothing in the Act can be construed as 'superseding, amending, modifying, or repealing' the Clean Air Act and Clean Water Act, preserves this balance between the statutes. Nowhere in the legislative history is there language which indicates that Congress intended this language to reduce the performance standards of the Act to meet the requirements of other statutes.

44 Fed. Reg. 14,902, 15,051 (Mar. 13, 1979). The last sentence of this statement makes clear the context it addresses: the interaction between substantive performance standards promulgated under the various environmental statutes. In that context, complying with Regulation A promulgated under the Clean Water Act does not exempt an operator from also complying with a substantively different Regulation B under the Surface Mining Act. *See id.* at 15,050 (noting that the saving clause does not prohibit regulations that fill in a "regulatory gap" (quoting *In re Surface Mining Regul. Litig.*, 456 F. Supp. 1301 (D.D.C. 1978))). But that commentary does not address the interaction between the *enforcement* provisions of two environmental statutes when the substantive standards under both are the same.[7]

---

[7] Even if the Office of Surface Mining's interpretation of the saving clause answered the question presented, we would not afford it either *Chevron* or *Skidmore* deference. The language of the saving clause is unambiguous, even if its application is not straightforward (Continued)

12

And so we agree with the Sixth Circuit that allowing liability to be imposed under the Surface Mining Act for discharges that are exempted by permit from Clean Water Act liability would "modify" or "supersede" the Clean Water Act's permit shield in contravention of the saving clause. *See ICG Hazards*, 781 F.3d at 291–92. Plaintiffs may disagree with the way Virginia chose to enforce the substantive Clean Water Act and Surface Mining Act water-quality standards, but that disagreement does not allow us to find liability under the Surface Mining Act for conduct that is shielded by the Clean Water Act's permit shield.

## B.     Interaction between the Surface Mining Act's saving clause and substantive provisions

Plaintiffs argue that even if the saving clause applies, Supreme Court precedent dictates that it cannot be used to override substantive provisions of the Surface Mining Act. In doing so, Plaintiffs read *United States v. Locke*, 529 U.S. 89 (2000), and *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861 (2000), as establishing both that courts should "decline to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law," *Locke*, 529 U.S. at 106–07, and that courts should reject interpretations of saving clauses that "permit[] the law to defeat its own objectives" or "destroy itself," *Geier*, 529 U.S. at 872 (quoting *Am. Tel. & Tel. Co. v. Cent. Off. Tel., Inc.*, 524 U.S. 214, 228 (1998)). But this argument misconstrues those precedents and over-dramatizes the consequences of adopting Red River's position.

---

here, and no one has argued otherwise. *See Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, 842–43 (1984); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

Both *Geier* and *Locke* addressed saving provisions in the context of federal preemption, which involves complex questions of federalism not present when discussing the interplay between two federal regulatory regimes. In the federalism context, it makes sense to interpret saving clauses narrowly, because the consequence of a broad interpretation is more federal interference in matters that the states may validly regulate. Plaintiffs do not persuasively explain why these cases are relevant in this context despite their federalism focus.

But even if those cases espouse principles relevant in this context, both holdings were statute-specific and thus are not broadly generalizable. The *Locke* Court relied on principles of statutory interpretation to determine that a federal saving clause located within the same chapter as the liability rules for oil spills did not apply to preempt state regulations governing a different topic—the operation and design of oil tankers. 529 U.S. at 105–06. Likewise, *Geier* addressed whether traditional principles of conflict preemption continued to apply despite a saving clause. In doing so, the Court determined that an interpretation of the saving clause there that allowed a conflict not permitted by federal conflict-preemption principles would allow the federal law "to defeat its own objectives" or "destroy itself." 529 U.S. at 872 (quoting *Am. Tel. & Tel. Co.*, 524 U.S. at 228). Neither case can reasonably be read to hold that a substantive provision of a statute always supersedes a saving clause when the two conflict, and neither suggests that result here.[8]

---

[8] Both parties also try to marshal *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983), to support their arguments. *Shaw* discussed the scope of the Employee Retirement Income Security Act's saving clause, which states that its substantive provisions "shall not 'be (Continued)

14

Plaintiffs narrow this argument in their reply brief. There, they contend that saving clauses "should be interpreted narrowly to avoid doing damage to the substantive provisions of the act." Plaintiffs-Appellants' Reply Br. 13. They argue that adopting Red River's interpretation of the saving clause would "fundamentally alter[] two substantive provisions of the [Surface Mining Act]: the requirement that all mine operators comply with the performance standards (30 U.S.C. § 1265) and the right of citizens to enforce that requirement against any operator (30 U.S.C. § 1270)." *Id.* at 24.

This argument is also flawed. Red River's interpretation of the saving clause would not "defeat" the "objectives" of, "destroy," or fundamentally alter the Surface Mining Act for it does not solely regulate water pollution. Rather, it was enacted to more broadly "protect society and the environment from the adverse effects of surface coal mining operations." 30 U.S.C. § 1202(a). To implement that broad mandate, the Surface Mining Act authorizes the regulation of all aspects of surface coal mining, including resource maximization, land restoration, erosion prevention, vegetation protection, waste disposal, land stability, and water-pollution prevention. § 1265(b). So the Surface Mining Act's non-hydrologic performance standards continue to apply when they do not supersede, amend, modify, or repeal any other statutes listed in the saving clause. This problem only

construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States.'" *Id.* at 100–01. The Court considered whether that clause could save a New York state law from preemption. *Id.* In doing so, it determined that "the combination of Congress' enactment of an all-inclusive pre-emption provision and its enumeration of narrow, specific exceptions to that provision ma[d]e [them] reluctant to expand § 514(d) into a more general saving clause." *Id.* at 104. This unique combination of preemption and statute-specific concerns makes it difficult for this case to neatly fit within either party's argument.

15

arises for the Surface Mining Act regulations that govern the same areas as the Clean Water Act.

Even if the Surface Mining Act was enacted because "Congress recognized that the [Clean Water Act] is inadequate to eliminate pollution from inactive mines," *Consolidation Coal Co.*, 604 F.2d at 251, reading the saving clause to prevent Surface Mining Act liability for pollutant discharges shielded from Clean Water Act liability by a permit leaves the Surface Mining Act with plenty of room to regulate surface coal mining operations without being subject to the saving clause. Citizens can still enforce the Surface Mining Act's rules and regulations, and mine operators must still meet the Surface Mining Act's standards in the many other contexts the Act regulates. Plaintiffs' argument to the contrary is an exaggerated parade-of-horribles that strays from the rest of the Surface Mining Act's statutory scheme.

\*       \*       \*

We are not unsympathetic to concerns about the purity of the water that Virginians rely on every day. But we must follow the text of the statute that was democratically passed by Congress. Permitting liability under the Surface Mining Act for pollutant discharges that are otherwise exempted from liability under a Clean Water Act permit would contravene the text of the saving clause by allowing the Surface Mining Act to "supersede," "modify," or "amend" the Clean Water Act's permitting regime. *See ICG Hazards*, 781 F.3d at 291. For that reason, the district court's grant of summary judgment to Red River on the Surface Mining Act claim is

AFFIRMED.

16